Nebraska Supreme Court Online Library
www.nebraska.gov/apps-courts-epub/
08/19/2016 09:08 AM CDT

Kyel Christine Hopkins, appellee, v.
Robert Keith Hopkins, appellant.

___ N.W.2d ___

Filed August 19, 2016.    No. S-14-790.

1. **Statutes: Judgments: Appeal and Error.** The meaning and interpretation of a statute are questions of law. An appellate court independently reviews questions of law decided by a lower court.
2. **Judgments: Evidence: Appeal and Error.** Despite de novo review, when credible evidence on material questions of fact is in irreconcilable conflict, an appellate court will, when determining the weight of the evidence, consider that the trial court observed the witnesses when testifying, and used those observations when accepting one version of the facts over the other.
3. **Modification of Decree: Appeal and Error.** Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court.
4. **Child Custody.** Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.
5. **Modification of Decree: Child Custody: Proof.** In a child custody modification case, first, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests.
6. **Child Custody: Convicted Sex Offender.** Neb. Rev. Stat. § 43-2933(1) (Reissue 2008) guides custody determinations when a person required to register under the Sex Offender Registration Act has access to a child.
7. ____: ____. Neb. Rev. Stat. § 43-2933(1)(b) (Reissue 2008) applies when a party seeking custody resides with a person required to register under the Sex Offender Registration Act and that person committed an

underlying offense that was either a felony in which the victim was a minor or an offense making the offender's access to a child contrary to the child's best interests. Subsection (1)(c) applies when a person required to register under the Sex Offender Registration Act has unsupervised contact with a child and the underlying crime was a felony involving a minor victim.

8. **Presumptions: Proof: Words and Phrases.** A presumption is the evidentiary assumption of one fact (the presumed fact) based upon proof of other facts (the predicate facts). The presumed fact is taken as true unless the opponent of the presumed fact meets a particular burden of proof.

9. ____: ____: ____. The "bursting bubble" presumption shifts only the burden of production, and if that burden is met, the presumption disappears.

10. ____: ____: ____. Under the "Morgan" theory of presumptions, a presumption shifts the burdens of both production and persuasion, and the presumption remains in evidence even if the opponent's burden is met.

11. **Statutes: Proof.** The plain language of Neb. Rev. Stat. § 43-2933(1)(c) (Reissue 2008) shifts only the burden of production.

12. **Child Custody: Convicted Sex Offender.** Neb. Rev. Stat. § 49-2933 (Reissue 2008) requires a trial court to consider whether, in its discretion, a sex offender poses a risk, sufficiently great or important to be worthy of attention, of committing a sexual offense against the child or children in question.

13. **Proof.** The determination that a party has met its burden of production can involve no credibility assessment; the burden-of-production determination necessarily precedes the credibility-assessment stage.

14. **Statutes: Legislature: Public Policy.** It is the Legislature's function through the enactment of statutes to declare what is the law and public policy.

Petition for further review from the Court of Appeals, Moore, Chief Judge, and Pirtle and Bishop, Judges, on appeal thereto from the District Court for Phelps County, Terri S. Harder, Judge. Judgment of Court of Appeals affirmed.

Kent A. Schroeder, Kenneth F. George, Mindy L. Lester, and D. Brandon Brinegar, of Ross, Schroeder & George, L.L.C., for appellant.

Nicholas D. Valle, of Langvardt, Valle & James, P.C., L.L.O., for appellee.

Heavican, C.J., Wright, Connolly, Miller-Lerman, Cassel, and Stacy, JJ.

Heavican, C.J.

## I. NATURE OF CASE

Robert Keith Hopkins seeks review of the Nebraska Court of Appeals' decision affirming the district court's denial of Robert's counterclaim for custody of his daughters. Robert, whose marriage to Kyel Christine Hopkins was dissolved in March 2004, asserts that under Neb. Rev. Stat. § 43-2933 (Reissue 2008), custody should be modified, because Kyel is now married to Thomas Rott (Thomas), a registered sex offender.

The question presented is whether Kyel has met her statutory burden to produce evidence that the girls are not at significant risk and, if so, whether the district court abused its discretion by finding that the girls were not at significant risk. Guided by the plain language of § 43-2933, we affirm the district court's denial of modification.

## II. BACKGROUND

In 2004, Robert and Kyel divorced. The decree granted Kyel full custody of their two daughters, with regular visitation for Robert. The parties each also have children from other marriages not relevant to our review.

In January 2013, Kyel filed an application to modify visitation. Robert counterclaimed, seeking full custody. Robert asserts that he should be granted a modification of custody, because Kyel's current spouse, Thomas, resides with and has unsupervised access to the children and is a registered sex offender for reason of a felony involving a minor. Robert alleges he was not aware of Thomas' sex offender status until July 2013, after Kyel initiated modification proceedings.

### 1. Thomas' Offenses, Incarceration, and Rehabilitation Efforts

In 2002, Thomas sexually assaulted his minor stepdaughter from a prior marriage. The probable cause affidavit for Thomas'

arrest stated that the victim alleged that Thomas had rubbed her breasts and vaginal area 12 to 14 times over the course of 2 years, including digital penetration one time and penetration with a vibrator one time. But Thomas did not admit to these precise facts. According to the affidavit, Thomas admitted that he had touched the minor's breasts five to six times, penetrated her once digitally, and rubbed her with a vibrator. At trial on the application to modify, Thomas testified that the inappropriate touching lasted a period of 3 to 4 months, and not the 2 years alleged by the victim.

The State charged Thomas with two counts of first degree sexual assault, and one count of sexual assault of a child. Thomas eventually pled guilty to a modified count one, attempted sexual assault of a child, and the other charges were dismissed by the State. Thomas was incarcerated from 2003 to approximately 2007. He completed several voluntary rehabilitative programs while in prison. Among these was "GOLF 3," which was a program designed specifically for sex offenders. Thomas testified that after "he had done everything at that point that I could for what they had" and participating in individual counseling at the state penitentiary, he applied for and was admitted to an inpatient sex offender program at the Lincoln Correctional Center for more intensive rehabilitation. Thomas applied for this program after he had already been denied any opportunity for parole. At the trial on modification, Thomas testified that he participated in the inpatient program "to make sure that what happened would never ever happen again." Thomas testified that he has not been investigated for any sexual misconduct since his incarceration.

## 2. THOMAS' ACCESS TO CHILDREN

A few years after Thomas' release, he and Kyel began dating in May 2010, and they moved in together that August. They married in 2012. Some evidence at trial revealed that initially, Kyel was reluctant to address Thomas' criminal history. Joan Schwan, the children's therapist, testified that Kyel

stated she preferred to put the thought of Thomas' history out of mind. At first, Kyel allegedly told Schwan that Thomas' conviction was the result of a bad divorce—a fact Schwan discovered to be untrue upon her own investigation. At trial, Schwan testified that she recommended the family be open about Thomas' criminal history and stated that Kyel's apparent denial of that history was concerning.

Other evidence in the record reveals that in 2004, Kyel dated, and had a child with, a different man who later pled guilty to a misdemeanor charge of attempted sexual assault of a child for digitally penetrating one of Kyel's other daughters.

Robert testified at the trial for modification that Kyel took no steps to investigate Thomas' background, but Robert also admitted to having no personal knowledge of this fact. In fact, Kyel and Thomas both testified that Thomas told Kyel everything about his sex offender status before they moved in together. Kyel also testified that before deciding to move in, she discussed Thomas' history with a Child Protective Services hotline and with family members, seeking their advice. Although Kyel initially concealed Thomas' sex offender status from the girls, under Schwan's direction, Kyel eventually told them during a therapy session.

The record shows that Thomas has unsupervised time with the children each day from 6 to 7 a.m. Thomas has also taken each of the girls hunting alone. The household takes precautions such as ensuring there is a lock on the bathroom door, adjusting shower schedules, establishing a dress code, having the girls change in private, and limiting Thomas' time alone with one child. Kyel and Thomas also informed other parents of his sex offender registration status before children came over to their house. Both girls testified they felt safe with Thomas, and neither girl reported any actions of a sexual nature.

Schwan testified at the trial for modification. She stated that the children have not reported any "grooming behaviors" (methods sexual abusers use to build a child's trust). Thomas has had angry outbursts in front of the girls—one time he

abruptly stopped his car during an argument with the girls and another time he threw a brick. Schwan additionally testified that the girls reported Thomas had once punched a grain bin. Robert contends that these incidents are red flags. Schwan, however, disagreed. Schwan described grooming behaviors as actions an offender takes to test whether a child is likely to keep inappropriate behavior secret. For example, if an offender were to give a child special treatment, and tell the child not to reveal that special treatment to a parent, that would be a red flag. Schwan's description of grooming behaviors did not include angry outbursts.

Schwan has never met Thomas, nor was she offered to the court as an expert witness in adult sex offenders. Although Schwan had reviewed some of Thomas' prison records (which are not part of the record on appeal), she testified that she had no basis to determine whether Thomas had actually been rehabilitated. Schwan related only her opinion, based upon contact with Kyel and the girls, that there was no risk to the girls. The district court found that Schwan's opinion was entitled to "considerable weight."

Other than Thomas' unsupervised access to the children, Robert presented no evidence of a material change in circumstances since the decree; Robert relies solely on § 43-2933 for modification.

### 3. BEST INTERESTS OF CHILDREN

Aside from exploring Thomas' risk level as a sex offender, the parties also presented evidence generally concerning the best interests of the children. Both Robert and Kyel called character witnesses, who generally vouched for each of Robert and Kyel's credentials as good parents. Robert testified that on one occasion in or around 2010, Kyel's home was cramped and very messy, with food and items on the floor. Robert also expressed concern that Kyel apparently was not proactive about investigating Thomas' criminal history before moving in with him. However, this testimony was contradicted by Kyel's and Thomas' own testimony.

The children, by all accounts, love both of their parents and get along well with them. The girls seem to be generally happy and doing well in school. The younger daughter testified that she would like to live with Robert in order to spend more time with her father and half siblings there. But Schwan testified that the younger child probably does not understand what that would be like in the long term because she is somewhat emotionally delayed. The older daughter testified that she was unsure which parent she would like to live with and preferred not to make a decision.

### 4. Procedural History

The district court denied Kyel's application to modify, finding there was no material change in circumstances. Kyel did not appeal this determination, and we will not review it. The district court then assessed Robert's counterclaim under § 43-2933, which controls when a party to a custody suit is or resides with someone who is required to register under the Sex Offender Registration Act (SORA). The full statutory scheme of § 43-2933 is described below.

The district court found that the facts of this case triggered a presumption under § 43-2933(1)(c) against Kyel's having custody. But the district court held that Kyel had overcome that presumption based upon Schwan's testimony. It also discussed Thomas' successful completion of rehabilitative programs and the lack of any allegations of sexual misconduct since 2003.

The Court of Appeals affirmed as modified.[1] That court's modification is not relevant to the issues on appeal. It found that the presumption against custody had been overcome and affirmed the district court's continued award of custody to Kyel.

Robert filed a petition for further review, which we granted because the interpretation of § 43-2933(1)(c) is an issue of first impression.

---

[1] *Hopkins v. Hopkins*, 23 Neb. App. 174, 869 N.W.2d 390 (2015).

### III. ASSIGNMENTS OF ERROR

On further review, Robert assigns, consolidated and restated, that the Court of Appeals erred by (1) finding that Kyel had rebutted the § 43-2933(1)(c) presumption and (2) failing to award custody to Robert.

### IV. STANDARD OF REVIEW

[1] The meaning and interpretation of a statute are questions of law. An appellate court independently reviews questions of law decided by a lower court.[2]

[2] Despite de novo review, when credible evidence on material questions of fact is in irreconcilable conflict, an appellate court will, when determining the weight of the evidence, consider that the trial court observed the witnesses when testifying, and used those observations when accepting one version of the facts over the other.[3]

[3] Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court.[4]

### V. ANALYSIS

Robert asserts that if, as here, a person required to register under SORA because of a felony offense involving a minor victim resides with a party seeking custody and the person has unsupervised contact with a child, § 43-2933(1)(c) creates a very strong presumption against custody. Robert argues that the Court of Appeals failed to impose a strong enough burden upon Kyel.

We disagree with Robert's assessment of § 43-2933(1)(c). As discussed extensively below, the Legislature has chosen, with explicit language, precisely how courts should proceed in custody suits involving unsupervised contact by sex

---

[2] *State v. Neisius*, 293 Neb. 503, 881 N.W.2d 572 (2016).

[3] *State ex rel. Medlin v. Little*, 270 Neb. 414, 703 N.W.2d 593 (2005).

[4] *Caniglia v. Caniglia*, 285 Neb. 930, 830 N.W.2d 207 (2013).

offenders. Under the Legislature's instruction, and limited by our standard of review, we find that Kyel overcame the presumption of § 43-2933(1)(c) and that Robert subsequently failed to prove the girls were at significant risk. Therefore, we affirm the Court of Appeals' affirmance of the district court's judgment.

## 1. PRESUMPTION IN § 43-2933(1)(c)

### (a) Statutory Scheme for
### Custody Determinations

[4-6] Ordinarily, custody of a minor child will not be modified unless there has been a material change in circumstances showing that the custodial parent is unfit or that the best interests of the child require such action.[5] First, the party seeking modification must show a material change in circumstances, occurring after the entry of the previous custody order and affecting the best interests of the child. Next, the party seeking modification must prove that changing the child's custody is in the child's best interests.[6] However, § 43-2933(1) guides custody determinations when a person required to register under SORA (offender) has access to a child. Under § 43-2933(3), if there is a change in circumstances regarding § 43-2933(1) or (2), modification is warranted.

Section 43-2933, in pertinent part, provides:

> [(1)](b) No person shall be granted custody of, or unsupervised parenting time, visitation, or other access with, a child if anyone residing in the person's household is . . . a[n] offender . . . as a result of a felony conviction in which the victim was a minor or for an offense that would make it contrary to the best interests of the child for such access unless the court finds that there is no

---

[5] *Schrag v. Spear*, 290 Neb. 98, 858 N.W.2d 865 (2015).

[6] *State on behalf of Jakai C. v. Tiffany M.*, 292 Neb. 68, 871 N.W.2d 230 (2015).

significant risk to the child and states its reasons in writing or on the record.

(c) The fact that a child is permitted unsupervised contact with a person who is required, as a result of a felony conviction in which the victim was a minor, to be registered as a sex offender under [SORA] shall be prima facie evidence that the child is at significant risk. When making a determination regarding significant risk to the child, the prima facie evidence shall constitute a presumption affecting the burden of producing evidence. . . .

. . . .

(3) A change in circumstances relating to subsection (1) or (2) of this section is sufficient grounds for modification of a previous order.

Speaking broadly, subsection (1)(a) applies in cases where the person seeking custody is an offender. Subsection (1)(b) governs custody determinations when a person seeking custody resides with an offender. Both subsections (1)(a) and (1)(b) state that custody shall not be granted "unless the court finds that there is no significant risk to the child." And subsection (1)(c) imposes a statutory presumption of significant risk in certain cases, explained further below.

[7] Subsection (1)(b) does not apply to every circumstance in which a person seeking custody resides with an offender. Rather, the subsection applies only if the offender committed an underlying offense that was either a felony offense in which the victim was a minor (felony) or an offense making the offender's access to a child contrary to the child's best interests (contrary-to-interest). Subsection (1)(c) applies when an offender has unsupervised contact with a child and the underlying crime was a felony-type offense. It imposes a presumption that there is a significant risk in these cases.

Thus, to reach subsection (1)(b), a court must ask whether a party seeking custody (or other access) resides with an offender who committed either an underlying felony or contrary-to-interest-type offense. If so, subsection (1)(b) applies and the

court shall not grant custody "unless the court finds that there is no significant risk to the child and states its reasons in writing or on the record." Next, to reach the subsection (1)(c) presumption, the court must determine whether the offender committed an underlying felony-type offense and whether the offender is permitted unsupervised access to the child. If the answer to both of these questions is yes, then (with exceptions not relevant here) subsection (1)(c) provides that these facts "shall be prima facie evidence that the child is at significant risk. When making a determination regarding significant risk to the child, the prima facie evidence shall constitute a presumption affecting the burden of producing evidence."

Finally, subsection (3) states that "[a] change in circumstances relating to subsection (1) . . . is sufficient grounds for modification of a previous order." We read this to mean that if the circumstances described in subsection (1) or subsection (2) were to arise after entry of an order, that order can be modified. For example, if after an initial order a party with custody moves in with an offender who committed a felony or contrary-to-interest offense, and the child is at significant risk, then that is a change in circumstances sufficient to modify custody.

Thomas is an offender with an underlying felony or contrary-to-interest offense, and he lives with Kyel, who has custody, so subsection (1)(b) applies. Specifically, Thomas committed a felony-type offense and also has unsupervised contact with the children; therefore, the presumption of significant risk under subsection (1)(c) also applies in this case. Should the court determine that there has been a change in circumstances placing the girls at significant risk in the context of subsections (1)(b) and (c), then subsection (3) calls for modification in Robert's favor, unless other mitigating factors (not relevant here) warrant retaining custody with Kyel.

The nature of the subsection (1)(c) presumption is the central controversy for our review in this case. It is interpreted in detail below.

### (b) Presumptions Generally

[8] Before proceeding to the merits of Robert's arguments, we take this opportunity to review presumptions generally. We have noted before that the term "presumption," though a term of art, is often conflated with other concepts.[7] Broadly, a presumption (sometimes called a rebuttable presumption) is the evidentiary assumption of one fact (the presumed fact) based upon proof of other facts (the predicate facts).[8] The presumed fact is taken as true unless the opponent of the presumed fact meets a particular burden of proof.

Burden of proof is another commonly confused term. It can mean, as relevant here, either the burden of persuasion or the burden of production.[9] The burden of persuasion requires the party bearing the burden to convince a fact finder to a particular standard of proof.[10] A burden of production requires parties to present particular evidence, regardless of whether that evidence actually persuades the finder of fact.[11]

[9,10] Generally, there are two types of presumptions. The "'bursting bubble'" presumption shifts only the burden of production, and if that burden is met, the presumption disappears.[12] As the U.S. Supreme Court explained in great depth in *St. Mary's Honor Center v. Hicks*,[13] "although the . . . presumption

---

[7] *McGowan v. McGowan*, 197 Neb. 596, 250 N.W.2d 234 (1977).

[8] *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 113 S. Ct. 2742, 125 L. Ed. 2d 407 (1993).

[9] See *id.*

[10] John T. McNaughton, *Burden of Production of Evidence: A Function of a Burden of Persuasion*, 68 Harv. L. Rev. 1382 (1955).

[11] *St. Mary's Honor Center, supra* note 8.

[12] Joel S. Hjelmaas, *Stepping Back From the Thicket: A Proposal for the Treatment of Rebuttable Presumptions and Inferences*, 42 Drake L. Rev. 427, 432 & n.27 (1993). See, also, R. Collin Mangrum, Mangrum on Nebraska Evidence 129 (2016).

[13] *St. Mary's Honor Center, supra* note 8, 509 U.S. at 507 (emphasis in original) (quoting *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

shifts the burden of *production* to the defendant, '[t]he ultimate
burden of persuading the trier of fact . . . remains at all times
with the plaintiff.'" Under the competing "Morgan" theory
of presumptions,[14] a presumption shifts the burdens of both
production and persuasion, and the presumption remains in
evidence even if the opponent's burden is met.[15]

Nebraska Evidence Rule 301[16] has adopted the Morgan
theory of presumptions as the default rule: "In all cases not
otherwise provided for by statute or by these rules a presump-
tion imposes on the party against whom it is directed the bur-
den of proving that the nonexistence of the presumed fact is
more probable than its existence."

### (c) Presumption in § 43-2933(1)(c)

Robert argues that § 43-2933(1)(c) is a Morgan presump-
tion, shifting both the burden of production and the burden
of persuasion. But § 43-2933(1)(c) "otherwise provides"[17] a
bursting bubble presumption. In pertinent part, § 43-2933(1)(c)
provides:

> The fact that a child is permitted unsupervised contact
> with a person who is required, as a result of a felony con-
> viction in which the victim was a minor, to be registered
> as a sex offender under [SORA] shall be prima facie evi-
> dence that the child is at significant risk. When making a
> determination regarding significant risk to the child, the
> prima facie evidence shall constitute a *presumption affect-
> ing the burden of producing evidence*.

(Emphasis supplied.)

---

[14] See Edmund M. Morgan, *Instructing the Jury Upon Presumptions and Burden of Proof*, 47 Harv. L. Rev. 59 (1933).

[15] Hjelmaas, *supra* note 12. See, also, Mangrum, *supra* note 12.

[16] Neb. Evid. R. 301, Neb. Rev. Stat. § 27-301 (Reissue 2008). See, also, 28 U.S.C. app. rule 301, notes on Committee on the Judiciary, H.R. Rep. No. 93-650 (1974) (describing original draft using "more probable than its existence" language, now found in Nebraska's rule, altered burden of persuasion).

[17] See Neb. Evid. R. 301.

[11] Robert is technically correct that subsection (1)(c) does not expressly state that rule 301 does not apply. However, absent anything to the contrary, statutory language is to be given its plain meaning, and a court will not look beyond the statute or interpret it when the meaning of its words is plain, direct, and unambiguous.[18] The plain language of § 43-2933(1)(c) shifts only the burden of production. We need not look beyond the scope of the statute, to rule 301, to determine the effect of the presumption, because the statute is unambiguous. The Legislature used clear and direct language. To read subsection (1)(c) as imposing the same presumption as rule 301 would render the statute's presumption language superfluous and meaningless.

Both Robert and Justice Connolly's dissent raise our per curiam decision in *Watkins v. Watkins*[19] to assert that under the rules of statutory construction, we are required to find that subsection (1)(c) does more than merely shift the burden of production. In *Watkins*, a father sought to modify custody of his children because the children's mother resided with a registered sex offender. In that case, however, the offender had committed an underlying misdemeanor contrary-to-interest offense—not a felony offense. Therefore, we assessed whether the offender in that case was a significant risk under subsection (1)(b) alone, without reference to the subsection (1)(c) presumption. However, we interpreted subsection (1)(b) to create a presumption of significant risk.

But, in retrospect, the language of subsection (1)(b) does not support the interpretation this court made in *Watkins*, and we now disapprove of our reasoning in that case to the extent it is inconsistent with the instant opinion. Section 43-2933(1)(b) reads:

> No person shall be granted custody of, or unsupervised parenting time, visitation, or other access with, a child

---

[18] *State ex rel. Parks v. Council of City of Omaha*, 277 Neb. 919, 766 N.W.2d 134 (2009).

[19] *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013).

if anyone residing in the person's household is required
to register as a sex offender under [SORA] as a result
of a felony conviction in which the victim was a minor
or for an offense that would make it contrary to the best
interests of the child for such access unless the court finds
that there is no significant risk to the child and states its
reasons in writing or on the record.

Contrary to our decision in *Watkins*, we find the statute
requires only that the court must make *a* factual finding, not
that the court must find that there is a significant risk in the
absence of rebutting evidence. Thus, while subsection (1)(b)
and SORA indicate that the Legislature perceives a correlation
between sex offender criminal history and the risk that offender
poses to a child, subsection (1)(b) does not require any particu-
lar outcome based upon that criminal history alone.

Reading these subsections in the context of subsection
(1)(c) supports this interpretation. Subsection (1)(c) explicitly
establishes a presumption affecting the burden of produc-
tion. As discussed extensively above, the only two types of
presumptions are those shifting the burden of production and
those shifting both the burden of production and the burden
of persuasion.

Although we agree that the Legislature intended subsection
(1)(c) to make it more difficult for a parent to obtain or retain
custody in this situation, such intent causes us to reevaluate
*Watkins*—not ignore the plain language of the statute. Justice
Connolly urges us to ignore the explicit language of subsection
(1)(c) and find that subsection (1)(b) is a presumption shifting
the burden of production, and, therefore, subsection (1)(c) must
be a presumption shifting the burden of persuasion. We find
it more proper to implement the plain language of subsection
(1)(c), imposing a presumption shifting the burden of produc-
tion, and, therefore, we find subsection (1)(b) is not a burden-
shifting presumption at all.

Justice Connolly's dissent attempts to support its con-
trary interpretation by emphasizing language from the statute

referring to the facts of subsection (1)(c) as "prima facie evidence." The dissent correctly notes, citing to Nebraska case law, that "once a noncustodial parent establishes a prima facie case, a custodial parent must produce evidence that, *if believed by the trier of fact, would rebut the presumption* that a plaintiff is entitled to judgment."[20] (Emphasis supplied.) But the dissent fails to note that we have done exactly that. As we explained in depth above, if a party presents evidence giving rise to a presumption that shifts only the burden of production, the opposing party may overcome that presumption with evidence that, if believed by a reasonable fact finder, tends to disprove the presumed fact, regardless of whether that evidence ultimately persuades the court. By assessing whether Kyel's evidence, if believed, would rebut the presumption that Thomas posed a significant risk, we have correctly applied precisely the standard which the dissent accuses the court of ignoring.

Next, Justice Connolly, citing to a Nebraska case, implies that the court is splitting hairs, and states that "we have previously reasoned that it serves no purpose to impose a technical understanding of a legal term in a statute when the Legislature obviously intended a different result."[21] But, as noted, *Watkins* does not actually express legislative intent; subsection (1)(b) was not meant to establish a presumption. Therefore, we do not find that the Legislature obviously intended the dissent's desired result. The language of the statute requires our interpretation, and we see no indication that the Legislature

---

[20] See, *First Tennessee Bank Nat. Assn. v. Newham*, 290 Neb. 273, 859 N.W.2d 569 (2015); *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007); *Mefferd v. Sieler & Co.*, 267 Neb. 532, 676 N.W.2d 22 (2004); *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 595 N.W.2d 237 (1999); *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999).

[21] See *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *disapproved in part on other grounds, Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

intended a different outcome. We decline to exaggerate the impact of subsection (1)(c) based upon our erroneous interpretation of subsection (1)(b) in *Watkins*.

For these reasons, to overcome the presumption under § 43-2933(1)(c), Kyel was required only to produce evidence that the girls were not at significant risk.

## 2. Kyel's Evidence to Overcome § 43-2933(1)(c) Presumption

To determine whether Kyel produced evidence to overcome the presumption of § 43-2933(1)(c), we must identify what evidence might be relevant to prove or disprove that an offender poses a significant risk of harm. The Legislature has not defined "significant risk" in the context of § 43-2933, and we have never directly interpreted this part of the statute. Nor can this court locate legislative history to guide our reading of this term. This court has found similar statutes in other jurisdictions requiring a finding of no significant risk.[22] But we have not located case law discussing the meaning of the term thoroughly enough to be helpful here.

However, we note that the Legislature has found that sex offenders pose a high risk of recidivism.[23] And regulations formerly used by the Nebraska State Patrol, under authority granted by SORA, categorized "risk" to determine how likely an offender was to commit a repeat offense.[24] Therefore, we conclude that the harm contemplated in § 43-2933 refers to the probability that an offender will commit another sex offense, harming the child in question.

[12] The risk that an offender will reoffend need not be high or even probable in order to warrant a modification of custody under § 43-2933. The plain meaning of "significant,"

---

[22] See, Ariz. Rev. Stat. Ann. § 25-403.05 (2007); Cal. Fam. Code §§ 3030 and 3030.5 (West Cum. Supp. 2016).

[23] See Neb. Rev. Stat. § 29-4002 (Reissue 2008).

[24] See 272 Neb. Admin. Code, ch. 19, attach. B (2003).

as relevant here, is "[s]ufficiently great or important to be worthy of attention."[25] Thus, § 43-2933 requires a trial court to consider whether, in its discretion, a sex offender poses a risk, sufficiently great or important to be worthy of attention, of committing a sexual offense against the child or children in question.

We have discovered little authority to clarify what evidence may be necessary in order to measure risk. And we do not presume to name an exhaustive list of circumstances which might indicate the presence or absence of a significant risk of harm. Nor do we limit the method by which the risk of harm may be established. Instead, we note that the trial court's discretion is integral to this analysis. A trier of fact benefits from the opportunity to hear and observe witnesses. Generally, therefore, it is in a better position than appellate courts to make credibility determinations essential to the assessment of significant risk.

As discussed, because Thomas is a sex offender with an underlying felony offense and because he has unsupervised contact with the girls, it is presumed that the girls are at significant risk, requiring modification. Subsection (1)(c) operates to shift the burden of production—in other words, it is a bursting bubble presumption. Thus, to overcome the presumption, Kyel was required only to present evidence tending to prove that Thomas was not a significant risk to the girls. If she presented such evidence, then the presumption disappeared and the district court, as trier of fact, was not required to find that Thomas was a significant risk. Instead, the court was called upon to weigh the evidence presented and come to its own conclusion.

Both the district court and the Court of Appeals found that Kyel overcame the presumption of significant risk. Both courts referenced Thomas' rehabilitative treatment, the lack of any reports or suspicion of sexual offenses since 2002, the

---

[25] Oxford Dictionaries (Oxford Univ. Press), http://www.oxforddictionaries.com/definition/english/significant (last visited Aug. 3, 2016).

girls' testimony, and Schwan's testimony. Specifically, those courts considered Schwan's statements that the girls had not reported any "grooming behaviors" and that she had trained Kyel and the girls about red flags.

This evidence met Kyel's burden to produce evidence. Thomas' apparent commitment to rehabilitation, the substantial passage of time since his conviction, and the lack of any allegations against him since his release all tend to mitigate a risk of recidivism. Thus, the § 43-2933(1)(c) presumption disappeared and the district court was entitled to make factual findings free from any mandatory presumption.

[13] Robert argues that the presumption was not overcome, because the district court should not have given so much weight to Schwan's testimony. But, as noted, the credibility of Kyel's evidence should not impact its rebutting effect. "[T]he determination that a [party] has met its burden of production . . . can involve no credibility assessment[;] the burden-of-production determination necessarily *precedes* the credibility-assessment stage."[26]

We therefore conclude that Kyel overcame the presumption of subsection (1)(c), and Robert's first assignment of error is without merit.

### 3. MODIFICATION OF CUSTODY

In his second assignment of error, Robert argues that the district court erred by denying his counterclaim for modification. Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court.[27] Under § 43-2933(1)(b) and (3), if Thomas was a significant risk, such would have been grounds for modification.

---

[26] *St. Mary's Honor Center, supra* note 8, 509 U.S. at 509 (emphasis in original).

[27] *Caniglia, supra* note 4.

Once Kyel overcame the subsection (1)(c) presumption of significant risk, the district court was free to reach its own conclusion, within the bounds of its discretion, about whether Robert had proved sufficient grounds.[28] As in any other case, Robert, as the party seeking modification, bore the burden of persuasion. The subsection (1)(c) presumption had absolutely no impact on Robert's overall burden to prove that there were sufficient grounds to support his claim.[29]

[14] It is the Legislature's function through the enactment of statutes to declare what is the law and public policy.[30] It is not for this court to overrule the Legislature's policy determinations. An appellate court does not sit as a superlegislature to review the wisdom of legislative acts.[31] Thus, we must apply the presumption scheme of § 43-2933 as the Legislature has written. We cannot replace the bursting bubble presumption of § 43-2933 with a Morgan presumption shifting the burden of persuasion, or with a conclusive rule that offenders like Thomas can never have access to a child.

Further, though we conduct a de novo review on the record in custody determinations, we will not disturb the district court's ruling unless the district court abused its discretion.[32] A judicial abuse of discretion exists when a judge, within the effective limits of authorized judicial power, elects to act or refrains from acting, and the selected option results in a decision which is untenable and unfairly deprives a litigant of a substantial right or a just result.[33] Thus, we must review this case to determine whether, without regard to the presumption

---

[28] See *St. Mary's Honor Center, supra* note 8.

[29] See *id.*

[30] *In re Invol. Dissolution of Wiles Bros.*, 285 Neb. 920, 830 N.W.2d 474 (2013).

[31] *Gourley v. Nebraska Methodist Health Sys.*, 265 Neb. 918, 663 N.W.2d 43 (2003).

[32] *Caniglia, supra* note 4.

[33] *Salazar v. Scotts Bluff Cty.*, 266 Neb. 444, 665 N.W.2d 659 (2003).

of subsection (1)(c), the district court abused its discretion in finding that Robert had not met his burden to prove that Thomas posed a significant risk and that modification was not warranted.

Robert presented little evidence about the risk Thomas allegedly poses. Aside from showing that Thomas had sexually assaulted a minor 12 years prior to the trial on modification, and some contested evidence that Kyel was not proactive about investigating Thomas' underlying offense, Robert produced no evidence tending to show that Thomas was a significant risk. We acknowledge that Thomas was charged with three counts of sexually assaulting a child—his stepdaughter at the time—(though he was convicted of one count of attempted sexual assault) and that the victim was the same gender as the two children in question. In addition, at the time of trial, one of the girls was about the same age as Thomas' prior victim had been. These facts tend to weigh against a finding of no significant risk.

On the other hand, Kyel presented substantial evidence that Thomas was not a risk to the girls. Thomas had volunteered for extensive rehabilitation during his incarceration, even after he became ineligible for parole. He had not been investigated for any sexual wrongdoing since his release. It had been over a decade since Thomas' offense. And further, Thomas expressed remorse and exhibited a highly positive response to treatment. Moreover, there was no evidence that Thomas had any other criminal history or that he had a psychological or psychiatric condition making him a high risk to reoffend.

In addition, we note that the girls testified they felt safe at home. Friends of Kyel and Thomas also testified that they did not feel he was a risk. Furthermore, Schwan, based upon her treatment of the girls, did not think Thomas was engaging in any grooming behaviors. Kyel and Thomas also testified about the precautions taken in the home to make everybody feel safe, and Thomas testified extensively about his personal

motivations to avoid any future offenses. By all accounts, the girls get along well living with Kyel and Thomas and appear to be happy and healthy.

Our de novo review, therefore, reveals considerable evidence that Thomas was not a significant risk to reoffend, and only limited evidence that Thomas was a risk. We cannot say, in light of Robert's failure to produce more convincing evidence to prove there was a significant risk, and Kyel's abundance of rebutting evidence, that the district court's finding was untenable.

The district court did not abuse its discretion in finding that Thomas was not a significant risk and denying modification of custody under § 43-2933. To come to a contrary conclusion would require a credibility assessment; to find for Robert, we would need to find that Kyel's evidence lacked credibility to such an extent that the district court's finding was untenable. But despite de novo review, when credible evidence on material questions of fact is in irreconcilable conflict, an appellate court will, when determining the weight of the evidence, consider that the trial court observed the witnesses when testifying, and used those observations when accepting one version of the facts over the other.[34] Thus, we decline to usurp the district court's role in this case.

Nor can Robert successfully argue that modification was warranted under any other theory. To be granted modification, Robert must prove that there has been a material change in circumstances making modification to be in the best interests of the children.[35] Robert attempted to prove this through the framework of § 43-2933 and did not produce evidence of any other changes in circumstances. Because Robert proved neither a material change in circumstances generally nor grounds for modification under § 43-2933(3), his second assignment of error is without merit.

---

[34] See *State ex rel. Medlin, supra* note 3.

[35] *Schrag, supra* note 5.

## VI. CONCLUSION

It is the province of the legislative branch, and not of this court, to create policy. The court is charged with neither the duty nor the power to question the wisdom of that policy. Robert asks us to place a burden upon Kyel higher than the burden legislatively imposed; essentially, Robert requests a de facto rule that a person residing with a felony offender can never retain custody. But the Legislature has not enacted such a policy. The plain language of § 43-2933(1)(c) establishes a presumption shifting only the burden of production. The Legislature could have created a presumption against custody with a more demanding burden. It is not within this court's power to expand the scope of the Legislature's policy.

Though Kyel presented significant evidence that Thomas was not a risk, she was not required to do so beyond her initial burden to produce *anything* to overcome the presumption. Thus, Robert incorrectly framed the issue by arguing that Kyel failed to prove that Thomas was not a risk. The burden to prove that modification was warranted remained at all times upon Robert. And the district court did not abuse its discretion by finding that Robert failed to meet that burden.

The decision of the Court of Appeals is affirmed.

AFFIRMED.

CONNOLLY, J., dissenting.

Let me get this straight. The female children in this case are statutorily presumed to be at a significant risk of harm because their mother moved them in with a felony sex offender. The sex offender previously committed sexual assaults against a different female child, his former stepdaughter with whom he was living, and he now has unsupervised access to the children who are the subject of this appeal. The children's therapist, on whose opinion the trial court heavily relied, could not say whether Thomas Rott (Rott) presented a risk of reoffending. But according to the majority, all that the mother needs to do to overcome the statutory presumption that these circumstances warrant a change in custody is to present any

evidence—persuasive or not—that the sex offender does not present a risk of harm. As a south central Nebraska sage I knew would often say, "It just ain't right."

It "ain't right" because the majority's reasoning is contrary to both the Legislature's obvious intent in Neb. Rev. Stat. § 43-2933 (Reissue 2008) and common sense. It leaves the noncustodial father, who is willing and able to care for his children, feeling helpless to protect his children. And I do not believe the Legislature intended to create a "bursting bubble" presumption under § 43-2933(1)(c), as the majority concludes. Nebraska's statutes and the Legislature's public policy determinations are inconsistent with holding that unpersuasive evidence is sufficient to rebut a prima facie claim under § 43-2933(1)(c). I believe that when a custodial parent is living with a person who has committed a felony sex offense against a minor and giving that person unsupervised access to the parent's child, Neb. Evid. R. 301[1] should apply to require the parent to overcome the presumption of risk by a preponderance of the evidence.

Here, we have a custodial parent who is living with a felony sex offender and giving that person unsupervised access to her children. This court should require evidence of an assessment, by a qualified evaluator, to show that there is no significant risk that this sex offender will harm these children. These facts amply illustrate why the majority's statutory interpretation will lead to absurd results.

## I. § 43-2933 ESTABLISHED A PRESUMPTION OF RISK TO PROTECT CHILDREN

### 1. § 43-2933 Contains Three Presumptions

Although the majority avoids this problem through a tortuous statutory analysis, in child custody disputes involving a sex offender, § 43-2933(1) sets out three fact patterns that trigger a statutory presumption that the offender presents a

---

[1] Neb. Rev. Stat. § 27-301 (Reissue 2008).

significant risk of harm to a child. The presumptions of risk apply to (1) persons who have committed an offense that requires them to register as a sex offender under the Sex Offender Registration Act (SORA)[2]; (2) persons who are living with a sex offender; and (3) persons who are giving a sex offender unsupervised access to a child who is the subject of the custody dispute.

The second and third fact patterns are present here. If any presumption controls under subsection (1), then under § 43-2933(3), a "change in circumstances relating to subsection (1) . . . of this section is sufficient grounds for modification of a previous order."

Under § 43-2933(1)(a), a court shall not grant a sex offender custody, unsupervised parenting time, visitation, or other access to a child if the offender has committed one of three types of SORA offenses—"unless the court finds that there is no significant risk to the child and states its reasons in writing or on the record." By prohibiting the sex offender's access to a child—unless a court explicitly finds there would be no significant risk—the Legislature has presumed that the offender's access to the child presents a significant risk of harm. Under § 43-2933(1)(a), that presumption exists if the SORA offense (1) would make access to the child contrary to his or her best interests; (2) was committed against a minor; or (3) was a crime under "section 28-311, 28-319.01, 28-320, 28-320.01, or 28-320.02." Under § 43-2933(3), any of these circumstances is a sufficient reason to modify an existing custody order unless the court finds that there is no significant risk and states its reasoning.

Subsection (1)(b) is similar in construction to subsection (1)(a) but applies to persons who are residing with a sex offender. It provides that a court shall not grant such a person custody, unsupervised parenting time, visitation, or other

---

[2] See Neb. Rev. Stat. §§ 29-4001 to 29-4014 (Reissue 2008, Cum. Supp. 2014 & Supp. 2015).

access to a child if the cohabitating sex offender committed one of two types of SORA offenses—unless the court finds that there is no significant risk to the child and states its reasoning. The presumption of significant risk of harm applies if the cohabitating sex offender's SORA offense (1) was a felony offense against a minor or (2) would make access to the child contrary to the child's best interests.

## 2. AN OPPONENT OF THE SUBSECTION (1)(b) PRESUMPTION HAS THE BURDEN TO OVERCOME IT

Recently, in *Watkins v. Watkins*,[3] we unanimously held that when § 43-2933(1)(b) is read together with § 43-2933(3), the plain language of the statute created a presumption of risk that justifies a change in custody unless a court makes a finding of no significant risk:

> Thus, in applying § 43-2933, a district court must first determine whether there is an individual residing in the household who is required to register under [SORA] and, if so, whether the offense triggering the registration requirement is due to a felony conviction in which the victim was a minor, whether the offense triggering the registration would make it contrary to the best interests of the child whose custody is at issue, or whether the offense does not meet either of these two descriptions. If the district court finds the offense to be a felony involving a minor victim *or* an offense contrary to the best interests of the child, § 43-2933(1)(b), *there is a statutorily deemed change of circumstances*, § 43-2933(3), and custody shall not be granted to the person who resides with the sex offender unless there is a finding by the district court that the circumstances present no significant risk. In sum, *taken together, § 43-2933(1)(b) and (3) create a statutory presumption against custody being awarded to the person residing with a sex offender*

---

[3] *Watkins v. Watkins*, 285 Neb. 693, 829 N.W.2d 643 (2013).

*who committed the described offenses, but the presumption can be overcome by evidence.* The foregoing analysis applies to this case, and the district court followed this framework.[4]

Our explanation of the statutory scheme in *Watkins* was obviously not limited to SORA offenses that would make a custodial parent's access to his or her child contrary to the child's best interests because he or she was living with the sex offender. Unless a trial court makes a finding of no significant risk, a party's evidence that a cohabiting sex offender committed *either type* of specified SORA offense is a sufficient reason to modify a custody order—without presenting any further evidence of the offender's risk of reoffending. This is a legislative presumption that a person who committed the specified crime poses a recidivism risk unless the court finds otherwise.

In *Watkins*, we did not specify the type of evidence or standard of proof required to overcome the presumption. But the burden of production clearly fell on the custodial mother. And we did not treat the statutory presumption as a bursting bubble presumption. There, the mother was living with a registered sex offender and had custody of her two children from Sunday to Wednesday of each week. But she "testified that she had not allowed unsupervised contact between [her boyfriend] and the children and that she would not allow unsupervised contact in the future."[5] We noted that the mother's boyfriend had not committed a felony SORA offense against a minor. Yet, we agreed with the court's implicit finding that he had committed an offense that would make the mother's custody or unsupervised access to the children contrary to their best interests unless the presumption was overcome by evidence.

We set out the trial court's extensive factfinding, including the mother's prohibition of unsupervised contact between her

---

[4] *Id.* at 700-01, 829 N.W.2d at 649 (emphasis supplied).

[5] *Id.* at 702, 829 N.W.2d at 650.

boyfriend and the children when she had custody. We specifically noted that the court ordered no unsupervised contact in the future. Under those facts, we upheld the court's decision to not modify the custody arrangement, based on its finding that the children were not at significant risk.

But *Watkins* illustrates that a parent living with a sex offender must produce evidence that is sufficient to rebut the presumption of significant risk and support a court's finding of no significant risk. And *Watkins* is not distinguishable because the boyfriend had not committed a felony sex offense against a minor. Had he done so, § 43-2933's requirement that the mother rebut the presumption of significant risk of harm would have been even more commanding. And here, Rott did commit a felony sex offense against a minor.

### 3. WATKINS REQUIRES A PARTY TO OVERCOME THE SUBSECTION (1)(c) PRESUMPTION

Our reasoning in *Watkins* applies here because § 43-2933(1)(c) imposes a stronger presumption than the ones created under (1)(a) or (1)(b). Subsections (1)(a) and (b), when read together with § 43-2933(3), both create a statutory presumption that a court should modify a custody order unless the court finds no significant risk. But subsection (1)(c) creates *a prima facie case* that a child is at significant risk of harm if a parent is permitting a sex offender to have unsupervised access to a child and the offender committed a felony SORA offense against a minor:

> The fact that a child is permitted unsupervised contact with a person who is required, as a result of a felony conviction in which the victim was a minor, to be registered as a sex offender under [SORA] shall be prima facie evidence that the child is at significant risk. When making a determination regarding significant risk to the child, the prima facie evidence shall constitute a presumption affecting the burden of producing evidence. However, this presumption shall not apply if there are factors mitigating

against its application, including whether the other party seeking custody, parenting time, visitation, or other access is also required, as the result of a felony conviction in which the victim was a minor, to register as a sex offender under [SORA].

By creating a prima facie case, the Legislature intended to create a stronger presumption than the ones under subsections (1)(a) and (b), which can be rebutted solely by a court's findings of no significant risk. The Legislature would have reasonably concluded that once a noncustodial parent establishes a prima facie case, a custodial parent must produce evidence that, if believed by the trier of fact, would rebut the presumption that the noncustodial parent is entitled to judgment.[6]

And the mere fact that the Legislature also provided that the prima facie evidence shall affect the burden of producing evidence does not show it intended to create a bursting bubble presumption. The majority acknowledges that the distinction between the burden of production and the burden of persuasion can be confusing. And we have previously reasoned that it serves no purpose to impose a technical understanding of a legal term in a statute when the Legislature obviously intended a different result.[7]

Here, the Legislature could not have intended to create a weaker presumption under subsection (1)(c) than the presumption under subsection (1)(b) that we recognized in *Watkins*.

---

[6] See, e.g., *First Tennessee Bank Nat. Assn. v. Newham*, 290 Neb. 273, 859 N.W.2d 569 (2015); *In re Interest of Xavier H.*, 274 Neb. 331, 740 N.W.2d 13 (2007); *Mefferd v. Sieler & Co.*, 267 Neb. 532, 676 N.W.2d 22 (2004); *Nebraska Pub. Emp. v. Otoe Cty.*, 257 Neb. 50, 595 N.W.2d 237 (1999); *Father Flanagan's Boys' Home v. Agnew*, 256 Neb. 394, 590 N.W.2d 688 (1999). Compare, *Siouxland Ethanol v. Sebade Bros.*, 290 Neb. 230, 859 N.W.2d 586 (2015); *In re Estate of Hedke*, 278 Neb. 727, 775 N.W.2d 13 (2009).

[7] See, *Smeal Fire Apparatus Co. v. Kreikemeier*, 279 Neb. 661, 782 N.W.2d 848 (2010), *disapproved in part on other grounds, Hossaini v. Vaelizadeh*, 283 Neb. 369, 808 N.W.2d 867 (2012).

Under subsection (1)(b), the sex offender must be residing with the custodial parent. But the (1)(b) presumption applies even if the sex offender did not commit a felony sex offense against a minor and even if the custodial parent is not giving the sex offender unsupervised access to his or her child. And under *Watkins*, a custodial parent living with a sex offender must rebut that presumption by producing evidence sufficient to support a finding of no significant risk.

In contrast, the presumption under subsection (1)(c) applies only if both of these conditions are present: i.e., (1) the sex offender previously committed a felony sex offense against a minor and (2) the custodial parent is giving the offender unsupervised access to the child. And because these two conditions raise greater concerns about a child's safety, the presumption in subsection (1)(c) applies even if the sex offender is not living with the custodial parent. For example, it would apply if a custodial parent were allowing a felony sex offender to take his or her child on unsupervised hunting trips. Because subsection (1)(c) raises greater concerns about a child's safety, *Watkins* should minimally require an opponent of the presumption to present sufficient evidence to support a reasonable finding that a child is not at significant risk of harm because a felony sex offender, who committed a sex offense against a minor, has unsupervised access to the child.

### 4. MAJORITY'S OVERRULING OF *WATKINS* IS CONTRARY TO THE LEGISLATURE'S INTENT

#### (a) Majority Misconstrues § 43-2933 as Creating Only One Presumption of Risk

Applying *Watkins* here would avoid an interpretative inconsistency *and* a conflict with rule 301 by giving effect to the obvious requirement in § 43-2933 that someone produce evidence to support a court's finding of "no significant risk." But *Watkins* also presents a serious obstacle to the result that the majority wants to reach: i.e., that § 43-2933(1)(c) creates

only a bursting bubble presumption of risk that can be overcome with unpersuasive evidence. The majority's solution to this analytical hurdle is to overrule *Watkins*' holding that § 43-2933(1)(b) creates a presumption of significant risk. Yet, it concedes that the Legislature intended to make it more difficult for a parent to obtain or retain custody if one of the specified fact patterns under subsection (1)(c) exists. So, it comes to the illogical conclusion that because subsection (1)(c) creates merely a bursting bubble presumption, subsection "(1)(b) is not a burden-shifting presumption at all."

This statement can only be interpreted to mean that subsection (1)(b) creates no presumption. And the majority's reasoning necessarily extends to subsection (1)(a) because it contains the same language as subsection (1)(b). If either of these subsections created a presumption of risk, that presumption would undermine the majority's conclusion that subsection (1)(c) creates only a bursting bubble presumption. The majority's attempt to square a circle has distorted the legislative intent beyond recognition, and it has done so solely to justify an incorrect and unconvincing interpretation of subsection (1)(c). Yet, everything about the construction of § 43-2933 and the statutory scheme of the Parenting Act supports our interpretation in *Watkins* and refutes the majority's interpretation.

### (b) Majority's Interpretation Conflicts With the Structure of § 43-2933

The structure of § 43-2933 supports the conclusion that subsection (1) creates three presumptions of significant risk. The codified description of the statute explains that it deals with presumptions: "Registered sex offender; other criminal convictions; limitation on or denial of custody or access to child; *presumption*; modification of previous order." (Emphasis supplied.) And the three statutory presumptions are grouped together as subsections (1)(a), (b), and (c). If the Legislature had not intended to give the specified fact patterns

in subsections (1)(a) and (b) presumptive effect, it would not have grouped them with subsection (1)(c). That all three fact patterns trigger a presumption of significant risk is further shown by § 43-2933(3).

Section 43-2933(3) provides that a "change in circumstances relating to subsection (1) . . . is sufficient grounds for modification of a previous order." This provision cannot be squared with the majority's statement that "while subsection (1)(b) and SORA indicate that the Legislature perceives a correlation between sex offender criminal history and the risk that offender poses to a child, subsection (1)(b) does not require any particular outcome based upon that criminal history alone." This statement ignores the limitations in both subsections (1)(a) and (b) on custody and visitation orders unless the court finds no significant risk to a child. And why would the Legislature conclude that all of the fact patterns set out in subsections (1)(a), (b), and (c) were sufficient grounds for a modification if they did not *all* trigger a presumption of significant risk?

### (c) Majority's Interpretation Conflicts With Presumption Principles

I disagree with the majority's statement that regardless of whether a rebutting party's evidence would ultimately persuade a court, that party can overcome the presumption of a significant risk with evidence that "tends to disprove the presumed fact." Contrary to the majority's reasoning, I do not believe that evidence which is unpersuasive, and therefore insufficient to support a reasonable finding contrary to the presumed fact, can rebut a presumption—even if that presumption is characterized as a bursting bubble presumption.[8] Even if unpersuasive evidence could be sufficient to rebut a statutorily presumed fact in some cases, that rule should not apply here. Here, there

---

[8] See 2 McCormick on Evidence § 344 (Kenneth S. Broun et al. eds., 7th ed. 2013).

is no fact finder besides the trial court, and the court makes its decision at the close of all the evidence. So, there is no distinction between evidence that would "ultimately" persuade the court that the presumed fact (Rott presents a significant risk to these children) does not exist and evidence that is sufficient to rebut the presumption.

More important, courts generally give a presumption an effect that reflects the underlying social policy and the probability that proof of the basic fact supports an inference of the presumed fact, and to correct an imbalance in light of one party's superior access to the evidence.[9] Here, the Legislature created the presumption to protect children, a policy consideration that normally weighs heavily for a strong presumption.[10] A sex offender or person living with a sex offender has superior access to the relevant evidence regarding the recidivism risk to which a child is exposed. And as I discuss more later, Nebraska's SORA statutes presume that a sex offender presents a recidivism risk. All of these policy considerations weigh against concluding that unpersuasive evidence can rebut the presumption under § 43-2933(1)(c).

### (d) Majority's Interpretation Conflicts With Statutory Construction Principles

Contrary to bedrock statutory construction principles, the majority's interpretation renders part of the statutory language of § 43-2933(1)(a) and (b) meaningless and adds a requirement that does not exist. The requirement that a court find no significant risk under subsections (1)(a) and (b) is meaningless, because under the majority's interpretation of § 43-2933, only subsection (1)(c) creates a presumption of risk. If no presumption of risk is triggered under subsections

---

[9] See *id.*, § 343.

[10] See, *Alisha C. v. Jeremy C.*, 283 Neb. 340, 808 N.W.2d 875 (2012); 2 McCormick on Evidence, *supra* note 8, § 343.

(1)(a) and (b), why would a court need to find the absence of a significant risk?

Worse, because the majority concludes that any unpersuasive evidence will rebut its bursting bubble presumption, there will always be no risk presented by a sex offender's access to a child unless the court finds that a significant risk exists. The majority explicitly states, "*Should the court determine that there has been a change in circumstances placing the girls at significant risk* in the context of subsections (1)(b) and (c), then subsection (3) calls for modification in Robert's favor, unless other mitigating factors (not relevant here) warrant retaining custody with Kyel." (Emphasis supplied.) To conclude that a court must find a sex offender's access to a child presents a significant risk, the majority necessarily determines that our reasoning in *Watkins* was wrong. It states that "[c]ontrary to our decision in *Watkins*, we find [§ 43-2933(1)(b)] requires only that the court must make *a* factual finding, not that the court must find that there is a significant risk in the absence of rebutting evidence." (Emphasis in original.)

But the statute does not require a court to find that there *is* a significant risk absent rebutting evidence, and we did not hold that in *Watkins*. We held that the risk is presumed precisely because there is no requirement that a court find a sex offender's access to a child presents a significant risk when the offender committed a specified offense under § 43-2933(1)(b). Subsections (1)(a) and (b) required a court to find only that a child is *not* at significant risk. Adding a requirement that a trial court find a significant risk—instead of finding the absence of a significant risk—is contrary to the plain language of the statute, which apparently bears repeating:

> (b) No person shall be granted custody of, or supervised parenting time, visitation, or other access with, a child if anyone residing in the person's household is required to register as a sex offender under [SORA] for [one of the described offenses] *unless the court finds that*

> *there is no significant risk to the child and states its reasons in writing or on the record.*[11]

And if the court does not make that finding, the specified facts are a "change in circumstances [that] is sufficient grounds for modification of a previous order."[12] The statutory language could not be plainer. Our analysis in *Watkins* is not wrong, much less manifestly wrong.[13] And our analysis in *Watkins* is entirely consistent with the Legislature's intent in overhauling the Parenting Act in 2007.

### (e) Majority's Interpretation Conflicts With Scheme of the Parenting Act

Section 43-2933 was enacted as part of the 2007 legislative bill amending the Parenting Act.[14] One of the stated purposes for L.B. 554 was to recognize "the importance of maintaining parent-child relationships *while at the same time protecting victims of abuse and neglect*."[15] In the legislative findings, the Legislature clarified that protecting children was one of the act's purposes:

> Given the potential profound effects on children from witnessing child abuse or neglect or domestic intimate partner abuse, as well as being directly abused, the courts shall recognize the duty and responsibility to keep the child or children safe when presented with a preponderance of the evidence of child abuse or neglect or domestic intimate partner abuse . . . .[16]

Accordingly, every parenting plan must include "[p]rovisions for safety when a preponderance of the evidence establishes

---

[11] § 43-2933(1)(b) (emphasis supplied).

[12] § 43-2933(3).

[13] See *Potter v. McCulla*, 288 Neb. 741, 851 N.W.2d 94 (2014).

[14] See 2007 Neb. Laws, L.B. 554, § 14.

[15] Introducer's Statement of Intent, L.B. 554, Judiciary Committee, 100th Leg., 1st Sess. (Mar. 8, 2007) (emphasis supplied).

[16] Neb. Rev. Stat. § 43-2921 (Reissue 2008).

child abuse or neglect, domestic intimate partner abuse, unresolved parental conflict, or criminal activity which is directly harmful to a child."[17] And L.B. 554 enacted specific procedures to carry out the purpose of protecting children. These Parenting Act provisions also apply to modification proceedings commenced on or after January 1, 2008.[18]

When parties contest temporary custody and visitation orders, they must file a "child information affidavit" that includes "any circumstances of child abuse or neglect . . . that are likely to pose a risk to the child."[19] After a hearing, a court's temporary parenting order must include "provisions for safety and a transition plan, consistent with any court's finding of child abuse or neglect."[20]

Similarly, when a court must develop a parenting plan because the parties have not presented one for approval,[21] it must impose limitations to protect a child from harm if it finds by a preponderance of the evidence that a parent has committed specified acts, including child abuse or neglect.[22] The many possible limitations include changing the custody allocation, requiring supervised visitation and parenting time, and restraining a parent from communicating with a child.[23]

Significantly, § 43-2932, the statute immediately preceding the statute at issue here, sets out the burden of proof requirement when a court finds that a parent has engaged in a specified act: "The parent found to have engaged in the behavior specified in subsection (1) of this section has the burden of proving that legal or physical custody, parenting time,

---

[17] Neb. Rev. Stat. § 43-2929(1)(b)(ix) (Supp. 2015).

[18] See Neb. Rev. Stat. § 43-2924(1) (Reissue 2008). See, also, Neb. Rev. Stat. § 42-364(6) (Cum. Supp. 2014).

[19] Neb. Rev. Stat. § 43-2930(1) (Cum. Supp. 2014).

[20] § 43-2930(2)(d).

[21] See § 43-2929.

[22] See Neb. Rev. Stat. § 43-2932(1) (Cum. Supp. 2014).

[23] See § 43-2932(1)(b).

visitation, or other access to that parent will not endanger the child or the other parent."[24] So, § 43-2932 also sets out statutory presumptions that a child is placed at risk by a parent's previous wrongdoing unless the parent proves otherwise.

Sections 43-2932 and 43-2933 were both created as part of the 2007 amendments to the Parenting Act.[25] Section 43-2933 does not set out a separate procedure from the one created by § 43-2932. It sets out separate and stronger presumptions of risk and limitations on what a court can order in a parenting plan when a custody dispute involves a sex offender. Therefore, the procedural requirements for determining a final parenting plan under § 43-2932 should govern. That is, consistent with our holding in *Watkins*, the court must first find that a parent engaged in one of the specified activities under § 43-2933: (1) The parent committed a specified sex offense, (2) the parent is living with a person who committed a specified sex offense, or (3) the parent is giving a person who committed a specified sex offense unsupervised access to his or her child. If the court finds that a parent committed a specified act by a preponderance of the evidence, then the parent found to have engaged in the conduct should have the burden of proving that the child will not be endangered by the parent's access to the child.

Section 43-2932 and its sister statute, § 43-2933, should be read consistently so that § 43-2932 governs the general procedures and burdens of proof. Otherwise, under § 43-2932, if a court finds that a parent has been convicted of child abuse, for that reason alone, the parent has the burden of proving that his or her access to the child will not endanger the child. But under the majority's implicit interpretation of § 43-2933(1)(a), if the evidence shows that a parent has been convicted of first degree sexual assault of a child, this fact does not necessitate a judicial finding that the parent's access to a child

---

[24] § 43-2932(3).

[25] See L.B. 554, §§ 13 and 14.

presents no significant risk—because no meaningful statutory presumption of risk arises. This absurdity should be sufficient to show that the majority's interpretation could not be the Legislature's intent.

### (f) Majority's Interpretation Conflicts With the Presumption of Risk Under the Amended SORA Statutes

As explained, the probability that proof of the basic fact supports an inference of the presumed fact is a factor courts consider in determining the effect to give a presumption.[26] For this basic fact—proof of a felony sex offense against a minor—the Legislature has implicitly determined that there is a significant probability that the sex offender will reoffend for an extended period.

Before 2009, the Nebraska State Patrol determined the registration and notification requirements for sex offenders based on its individualized assessments of their high, moderate, or low recidivism risk.[27] In 2009, the Legislature abandoned that requirement and enacted an offense-based system of sex offender registration and notification rules.[28] The new registration and reporting requirements rely solely on the type of "registrable offense" that a sex offender committed.

Section 29-4005 now sets out three different registration periods for sex offenders, depending on the severity of the offense. As relevant here, if the registrable offense was punishable by imprisonment for more than 1 year, the registration and reporting period is for 25 years.[29] The record shows the court accepted Rott's guilty plea to a reduced count of attempted

---

[26] See 2 McCormick on Evidence, *supra* note 8, § 343.

[27] See *Slansky v. Nebraska State Patrol*, 268 Neb. 360, 685 N.W.2d 335 (2004).

[28] See, 2009 Neb. Laws, L.B. 285, § 11 (codified at § 29-4013 (Cum. Supp. 2014)); Introducer's Statement of Intent, L.B. 285, Judiciary Committee, 101st Leg., 1st Sess. (Mar. 18, 2009).

[29] § 29-4005(1)(b)(ii) (Cum. Supp. 2014).

sexual assault under a plea agreement. It sentenced him to 5 to 8 years' imprisonment, and attempted sexual assault is a registrable offense under § 29-4003.[30] So, if Rott were convicted today, his conviction would minimally require him to register as a sex offender for 25 years.

Under L.B. 285, the presumed risk represented by the severity of a sex offense is the public policy of this state and should certainly apply when a person who has committed a felony sex offense against a minor has unsupervised access to a child. I believe it is inconsistent with the unrebuttable presumption of risk under the SORA statutes to conclude that a party can rebut the presumption of risk under § 43-2933(1)(c) with unpersuasive evidence.

### (g) Nebraska Evidence Rule 301 Should Apply

In child custody modification appeals, we normally conduct a de novo review of the record to determine whether the trial court abused its discretion.[31] But the effect to be given a statutory presumption and the standard of evidence required to overcome it present questions of law that we independently review.[32]

All of the considerations for determining the effect of a presumption weigh for applying evidence rule 301 to the presumption under § 43-2933(1)(c). The Legislature's social policy is to protect children. It has statutorily determined that the fact of a felony sex offense against a minor has a strong correlation to the risk of reoffense. And a custodial parent living with a sex offender will have superior access to the relevant evidence. As I explain later, the noncustodial parent cannot

---

[30] § 29-4003(1)(a)(i)(C) and (N) (Cum. Supp. 2014).

[31] See *Watkins, supra* note 3.

[32] See, *Dawes v. Wittrock Sandblasting & Painting*, 266 Neb. 526, 667 N.W.2d 167 (2003), *disapproved on other grounds, Kimminau v. Uribe Refuse Serv.*, 270 Neb. 682, 707 N.W.2d 229 (2005); *Variano v. Dial Corp.*, 256 Neb. 318, 589 N.W.2d 845 (1999).

obtain it. So I believe that the Legislature obviously meant that if the (1)(c) presumption is triggered *and* the noncustodial parent is a suitable person to have custody, then the noncustodial parent is entitled to judgment in a custody dispute unless the custodial parent overcomes the presumed fact by a preponderance of the evidence. Any other conclusion lessens the significance of the sex offender's previous conduct, which is the point of the stronger presumption.

## II. MAJORITY OPINION WILL CREATE ARBITRARY JUDGMENTS

To recap, I believe the majority misconstrues § 43-2933(1)(c) to create a meaningless presumption of risk that bursts upon a custodial parent's production of unpersuasive evidence. Therefore, a noncustodial parent will always have the burden to prove that a sex offender's unsupervised access to his or her child presents a significant risk of harm. And whether a noncustodial parent has met this burden is a matter for a trial court's unguided discretion.

But the majority ignores two significant problems with its approach. First, the noncustodial parent does not have access to the information relevant to assessing a sex offender's recidivism risk. So, a custodial parent's claim that a sex offender presents no risk to a child can prevail even on unpersuasive evidence—as in this case. Upon that meager showing, the noncustodial parent has the burden to present unavailable evidence. Second, a trial court cannot make that assessment without the input of a qualified evaluator. The majority would presumably not hold that a trial court has discretion to determine whether a person suffers from a mental disorder absent an expert's opinion. I see no reason to treat this issue differently.

### 1. ONLY LAW ENFORCEMENT AGENCIES HAVE THE RELEVANT INFORMATION

In concluding that Kyel's evidence burst the statutory presumption, the majority relies, in part, on the lack of allegations

against Rott since his release from prison in 2007. But Kyel, of course, did not produce evidence showing there were no other allegations of sex offenses against Rott. So a reader must wonder how the lack of evidence supports the majority's conclusion that Kyel rebutted the presumption. This confusion would not be surprising because the majority actually implies that Robert had the burden to produce evidence of other sex offense allegations to prevent this factor from weighing for rebuttal of the presumption. Leaving aside that this implicit reasoning turns the concept of presumptions on its head, noncustodial parents will usually not have access to such information unless they happen to know about other victims.

Similarly, in concluding that Robert failed to prove Rott posed a significant risk to these children, the majority states that Rott has not been investigated for any sexual wrongdoing since his release from prison and that the evidence failed to show he has any other criminal history. These statements also impliedly impose a burden on noncustodial parents to present such evidence once a custodial parent presents unpersuasive evidence that a child is not at risk.

But Nebraska's statutes prevent a noncustodial parent from obtaining such evidence. In 2002, when the Nebraska State Patrol still performed individualized risk assessments for sex offenders, the Legislature enacted a measure to ensure that the State Patrol had access to the relevant information for determining a sex offender's recidivism risk under its assessment instrument.[33] Specifically, under the 2002 enactment, the State Patrol's personnel for the sex offender and community notification division have access to

> all documents that are generated by any governmental agency that may have bearing on sex offender registration and community notification. This may include, but is not limited to, law enforcement reports, presentence

---

[33] See 2002 Neb. Laws, L.B. 564, § 10 (codified at § 29-4013(2)(f) (Reissue 2008) and § 29-4013(5) (Cum. Supp. 2014)).

reports, criminal histories, birth certificates, or death certificates. . . . Access to such documents will ensure that a fair determination of what is an appropriate registration period is completed using the totality of all information available.[34]

The State Patrol still has access to this information, although it no longer performs individualized risk assessments. Instead, it provides this information to the Office of Parole Administration, which must perform an individualized risk assessment before releasing a sex offender who is subject to a lifetime registration requirement.[35]

But § 29-4009(1) restricts access to information in the sex offender registry if a sex offender's arrests did not result in a conviction. Such information can only be disclosed to "law enforcement agencies, including federal and state probation or parole agencies, if appropriate."[36] Both § 29-4009 and § 29-4013(4) impose restrictions on who can access information in the sex offender registry, and these statutes do not include courts or private parties to a custody dispute. Likewise, Neb. Rev. Stat. § 29-3523 (Supp. 2015) limits the information that a member of the public can obtain about an individual's criminal record, particularly for dismissed charges.

In short, unlike statutorily authorized agents, noncustodial parents cannot discover from official records whether a felony sex offender has a criminal history, other than the offense that resulted in the public notification, or whether there are other allegations of sex offenses. That lack of access illustrates the obvious reason for creating a statutory presumption. Contrary to that legislative intent, the majority's conclusion that Robert failed to produce persuasive evidence of Rott's

---

[34] § 29-4013 (Cum. Supp. 2014).

[35] See, Neb. Rev. Stat. § 29-4019 (Reissue 2008); Neb. Rev. Stat. §§ 83-174.02 and 83-174.03 (Reissue 2014); 272 Neb. Admin. Code, ch. 19, § 13 (2010).

[36] § 29-4009(1) (Cum. Supp. 2014).

recidivism risk will place a formidable, if not impossible, burden on noncustodial parents to prove their child is at a significant risk. Sex offender registration and notification laws exist specifically because sex offenders are presumed to pose a risk of reoffense and have no incentive to reveal their criminal histories.

## 2. COURTS ARE NOT EQUIPPED TO EVALUATE A SEX OFFENDER'S RECIDIVISM RISK

For various methodological reasons, commentators have noted that actuarial risk assessment instruments, like the one that the Nebraska State Patrol formerly used, underestimate a sex offender's long-term recidivism risk.[37] As we noted in *Slansky v. Nebraska State Patrol*,[38] studies have shown that sex offenders continue to present a risk for reoffending for up to 20 years after release or supervision. Nonetheless, research has shown that the accuracy of different approaches to predicting the long-term risk posed by sex offenders, in the aggregate, can be ranked in the following order: (1) actuarial assessments, like the one that the State Patrol used; (2) guided clinical assessments that rely on the systematic professional judgment of qualified professionals based on empirically derived instruments; and (3) unstructured clinical judgment.[39]

But a court presiding over a child custody dispute cannot perform an actuarial assessment because it does not have access to the relevant information or the training to use the instrument. And if a mental health professional's unstructured clinical judgment is the least effective approach to predicting a sex offender's recidivism risk, then an untrained trial judge obviously cannot determine that risk except through guesswork.

---

[37] See Andrew J. Harris, *Risk Assessment and Sex Offender Community Supervision: A Context-Specific Framework*, 70 Fed. Probation 36 (Sept. 2006).

[38] See *Slansky, supra* note 27.

[39] See Harris, *supra* note 37.

The majority's reasoning illustrates the problem. It casts the issue as a matter of determining credibility. But the noncustodial parent does not have access to information that would permit an effective cross-examination of that credibility. The majority emphasizes the lack of evidence showing Rott suffers from a mental health condition, his remorse for his offense, and his positive response to treatment. But despite Rott's sex offender treatment while in prison, this record contains no evidence of his treatment evaluation or whether he was diagnosed with a mental health condition that would exacerbate his recidivism risk. Similarly, the majority points to the lack of allegations that he committed other sexual acts without explaining how a noncustodial parent should obtain this information.

These problems show that interpreting § 43-2933 as imposing a bursting bubble presumption is not only contrary to the Legislature's intent but will result in custody decisions in which the risk to a child is unknown. Instead, the custodial parent, as the party living with the sex offender, should be the one who bears the burden of proving his or her child is not at risk, as the party who has access to the relevant information.

### III. KYEL FAILED TO REBUT
### THE PRESUMPTION OF A
### SUBSTANTIAL RISK

The majority reduces Robert's evidence to a concern that Kyel had not investigated Rott's criminal history. It concludes that Robert's concern was contradicted by Rott's and Kyel's testimonies.

Not so. The majority incorrectly states that Robert presented no other evidence of a material change in circumstances other than Rott's unsupervised access to the children. Kyel's failure to investigate Rott's offense was only part of the evidence supporting Robert's claim that Rott presented a significant risk to his daughters *and* that Kyel would not protect them. Robert showed that Kyel had previously failed

to protect her daughters from a sex offender and had willfully refused to face the risk posed to her daughters by giving another sex offender unsupervised access to them. Moveover, the majority omits the contradictions in Kyel's and Rott's testimonies about her knowledge of his conduct before moving in with him. And it emphasizes Rott's remorse about his previous sex offense, while diminishing evidence that he minimized his conduct.

I also disagree that the issue is whether Robert showed a material change in circumstances under our case law. The issue is whether Kyel rebutted the presumption that Rott presented a substantial risk to her children to avoid the statutorily mandated change in circumstances under § 43-2933(3). But Robert's evidence was relevant to whether Kyel had rebutted that presumption. And our decision in *Watkins* requires that analysis.

Robert presented evidence of the basic fact—Rott's conviction of a felony sex offense against a minor—that triggered the Legislature's presumption that his children were at a substantial risk because Rott had unsupervised access to them. Kyel presented no evidence of Rott's recidivism risk, despite being the party with access to this information. So, there was no conflicting evidence on Rott's recidivism risk. And if this evidence was sufficient to rebut the presumption of risk, there is no case in which the evidence would be insufficient. All a custodial parent needs to say is that a sex offender who has unsupervised access to his or her child has not yet harmed the child or taken steps to do so. The majority has set a low bar for custodial parents to circumvent the will of the Legislature.

Moreover, leaving aside the majority's bursting bubble presumption theory, I believe it misreads the record to conclude that Robert failed to show a material change in circumstances. First, it ignores evidence that Kyel has previously failed to protect her children from a sex offender. Second, it ignores the requirements of § 29-4013 when Rott was released from custody in 2007. The pre-2009 version of § 29-4013 required

the Nebraska State Patrol to assess Rott's recidivism risk.[40] So Rott's individualized risk assessment was available to Kyel—but not to Robert. Third, it emphasizes Rott's participation in sex offender treatment programs while ignoring statutes that show this emphasis is overstated. Rott had to participate in those treatment programs or face a civil commitment evaluation before he was released.[41] And if Rott was rehabilitated or given a low risk assessment in 2007, Kyel could have produced that proof. Fourth, the majority notes that there is no evidence of disciplinary actions taken against Rott in prison, no evidence of his criminal history, and no evidence that he had mental health disorders. But this evidence was also available to Kyel and not Robert. Finally, the majority ignores the admissions of the girls' therapist, Schwan, that she could not say whether Rott presented a risk of reoffense.

Instead, the trial court and the majority have relied on weak evidence that amounts to proof that because nothing has happened so far, the children are not at risk. But Rott and Kyel both have a history of minimizing their conduct. And of course, they had every incentive to do so. Having to take their word for the children's safety only emphasizes the need for a more reliable opinion about Rott's recidivism risk. That evidence did not exist. And I believe that the record shows that the majority's conclusion is unsupportable.

## 1. SUMMARY OF KYEL'S EVIDENCE SHOWS WHY MAJORITY INCORRECTLY CONCLUDES THE PRESUMPTION OF RISK WAS REBUTTED

Contrary to the majority's conclusions, the evidence did not show that these children were not at significant risk of harm. During these proceedings in July and August 2014, Robert and Kyel's daughters were ages 15 and 13. Kyel also had two

---

[40] See § 29-4013 (Reissue 2008 & Supp. 2007).

[41] See 2006 Neb. Laws, L.B. 1199, § 26 (codified at § 29-4014 (Reissue 2008)).

other daughters from other relationships who lived with her. The youngest one was age 8, and the oldest daughter was age 16.

### (a) Factual Basis for Rott's Criminal Conviction and Rott's Testimony About His Conduct

As the U.S. Supreme Court has explained, a sex offender's minimizing of his or her past conduct is a serious impediment to rehabilitation.[42] And the record shows that Rott and Kyel omitted or glossed over significant facts relevant to Rott's rehabilitation to minimize the risk that his unsupervised access to the children presented. It is not pleasant to set out the following facts. But I believe it is necessary, because Kyel did not produce evidence of Rott's treatment evaluation or his actuarial risk assessment.

Significant discrepancies existed between Rott's testimony and the facts underlying his sex offense conviction. As stated, in 2003, the State charged Rott with two counts of first degree sexual assault and one count of sexual assault of a child for conduct occurring from May 1, 2000, to February 28, 2002. A police officer's probable cause affidavit stated that in November 2002, Rott's former stepdaughter, who was then age 14, reported that Rott had sexually assaulted her for the past 2 years. She reported that he had touched or rubbed her breasts and vaginal area about 12 to 14 times in the previous 2 years. She said that he had also digitally penetrated her vagina on one occasion and penetrated her vagina with a vibrator on one occasion. The officer further stated that in a recorded interview, Rott admitted that he had touched and kissed his stepdaughter's breasts five to six times in the past 2 years, rubbed her vagina with a vibrator, and observed her as she masturbated.

---

[42] See *McKune v. Lile*, 536 U.S. 24, 122 S. Ct. 2017, 153 L. Ed. 2d 47 (2002).

But at trial, Rott minimized and contradicted his statements to the investigator about his conduct with his stepdaughter: "Over about a three to four month period I had inappropriately touched my stepdaughter, had sexual contact with her five or six times. It started with touching of her breast to using my finger on her vagina to using a vibrator on her vagina or clitoris." Rott said that he gave this account of his conduct to Kyel before she and her daughters moved in with him.

Rott said he and his stepdaughter had talked about her masturbating, but that he had never watched her. He said he did not deny this allegation in court because it was petty and he wanted to accept responsibility for his conduct. In contrast to his recorded statements to an officer in 2002, on cross-examination, he explicitly denied having sexual contact with his stepdaughter over a 2-year period. He said that the sexual contact occurred over a 3- to 4-month period. Later, he was asked why the threat of prison had not been a deterrent with his stepdaughter when he clearly knew that penetrating her was a crime. He denied penetrating her and said that when he committed those crimes, he did not think he could go to jail for his conduct.

Contrary to the majority's statements, in the recorded interview with an officer, Rott did *not* admit to digitally penetrating his stepdaughter. And the majority fails to mention that he did admit to touching and *kissing* his stepdaughter's breasts five to six times *over a 2-year period*. Additionally, contrary to his denial at trial, Rott admitted to the officer that he had watched his stepdaughter masturbate. Finally, the probable cause affidavit shows that his stepdaughter accused him of penetrating her vagina with a vibrator, not simply rubbing her with a vibrator as Rott stated.

We cannot know from this record whether Rott's stepdaughter gave a sworn statement about his conduct. But we have previously stated that a Nebraska State Patrol evaluator can consider a sex offender's sexual assault behavior as reflected in a victim's statement that supports a charged crime, even if

the charge did not result in a conviction: "[T]he prosecutor's decision to file the charge[s] and the absence of an acquittal or outright dismissal afford some basis for concluding that the facts reflected in the official documentation are true."[43] We have also observed that experts testifying in a sex offender's civil commitment case can rely on a sex offender's voluntary statements against interest.[44]

The majority opinion downplays both the significance of Rott's previous sexual assault behavior and his minimizing of his previous conduct. But these are factors that an expert would consider in assessing a sex offender's rehabilitation. And the evidence showed that both Rott and Kyel had concealed or minimized his previous conduct. Moreover, they contradicted each other regarding Kyel's knowledge of his conduct.

### (b) Rott and Kyel Minimized or Concealed Rott's Sexual Assault Behavior

Kyel began dating Rott in May 2010, about 3 years after he was released from prison. Kyel said that Rott told her his criminal history and had been honest about what he had done. She said that she knew he was a registered sex offender and that the crime involved his stepdaughter. Kyel testified that she "called the hot line for the child protective services" and spoke with her family members before deciding to move in with Rott in September 2011. They married in June 2012. But on cross-examination, Kyel admitted that she moved in with Rott about 3 months after she started dating him in 2010. Rott's testimony confirmed that Kyel and her children moved in with him in August 2010 after they had dated for 3 months.

In July 2013, Robert told one of his daughters not to trust Rott after he saw Rott's sex offender status online. The

---

[43] *McCray v. Nebraska State Patrol*, 271 Neb. 1, 15, 710 N.W.2d 300, 311 (2006).

[44] See *In re Interest of A.M.*, 281 Neb. 482, 797 N.W.2d 233 (2011).

daughter's anger at learning this information caused problems in Kyel's home. Robert's daughters both started therapy with Schwan in August 2013, shortly after his daughter found out about Rott's status.

During Schwan's pretreatment assessment, Kyel reported that the sexual assault allegations against Rott resulted from his going through a bad divorce. In contrast, Rott testified that by June 2010, Kyel knew that he had had sexual contact with his 14-year-old stepdaughter and that the charges against him were not the result of a messy divorce. Kyel told Schwan that she did not want to think about Rott's sex offender status and had pushed it to the back of her mind. Kyel admitted on cross-examination that she did not know the details of what Rott had done until after she started therapy sessions with Schwan.

In fact, the truth about Rott's previous conduct came to light only because Kyel's statements prompted Schwan to investigate. Schwan obtained Rott's prescreening report for inpatient sex offender treatment at the Lincoln Regional Center. This treatment occurred before Rott was released from custody in 2007. Schwan said at the time of the prescreening assessment that Rott had admitted to teaching his stepdaughter "how to French kiss," touching her vaginal area twice, and having sexual contact with her six to eight times.

Because Kyel had minimized Rott's conduct, Schwan went over this information with her. She encouraged Kyel to tell her daughters about Rott's past for their own protection because keeping things a secret "increases the risk." Kyel told her daugthers about Rott's past during a September 2013 therapy session. This was more than 3 years after Kyel had moved her daughters in with Rott. One daughter said that Kyel told her something happened with Rott's daughter when he was married to another woman but that no one had told her the whole story.

But on cross-examination, Schwan said that Kyel only reported to her what Rott had told Kyel about his going

through a bad divorce. Schwan was concerned that Rott had minimized his conduct. Yet, she did not know whether his minimizing was indicative of a risk to reoffend, because she was not his therapist and had not met with him. She said that she could see only what the Lincoln Regional Center report said. It is not clear why Schwan could not obtain information about Rott's treatment evaluation or his risk assessment if she could access his pretreatment assessment. The majority acknowledges that Schwan reviewed some of Rott's prison records that were not presented at trial. But the crucial point is that Schwan specifically stated that she could not personally say whether Rott had been rehabilitated *or whether he presented a risk to reoffend*. Rott said he had successfully completed the inpatient sex offender treatment program and had received documentation to show it. But Kyel did not produce that documentation.

In addition, Kyel's personal history raised concerns that she would not protect her daughters from sexual abuse. Schwan's pretreatment assessment showed that Kyel had minimized her former boyfriend's sexual abuse of her oldest daughter. Kyel reported to Schwan that one of her daughters had been in counseling when she was about age 5 or 6 because Robert's father and mother had alleged that Kyel's former boyfriend might have sexually abused her oldest daughter and that the other daughter might have witnessed it. Kyel reported to Schwan that after a law enforcement interview, the boyfriend was asked to leave the house.

But Schwan testified that the former boyfriend had sexually assaulted Kyel's oldest daughter. The evidence showed that the State had originally charged the former boyfriend with first degree sexual assault. But under a plea agreement, the court convicted him of attempted sexual assault on a child. Schwan acknowledged that Kyel's relationship with another sex offender created concern that she might "have blinders on for what was going on" and not set appropriate boundaries. Schwan admitted that she was concerned that Kyel had

not told her daughters about Rott's past until Schwan encouraged her to do so and that she was reluctant to acknowledge the seriousness of his conduct. And she admitted that Kyel's conduct in moving her daughters in with Rott without knowing the extent of what he had done was concerning. But she said that she was not Kyel's therapist when Kyel made that decision and could only give Kyel suggestions for dealing with the current situation.

Nevertheless, Schwan encouraged Kyel to see a therapist for herself, in part because Kyel had also been sexually abused as a child. She said that research has shown this history creates a risk that a woman might not recognize red flags when her children are at risk for sexual abuse. Schwan believed Kyel was working on recognizing warning signs, but she said that working on her own issues in therapy would help. Schwan did not know whether Kyel had complied.

The fact remains that Kyel did not tell her daughters about Rott until one daughter learned about his status from Robert. Kyel's excuse was that she did not want her daughters to be stigmatized if it got around school that their stepfather was a sex offender. But she also said that if one of her daughters invited a friend over, she would tell the parent that Rott was a registered sex offender. Kyel also did not tell Robert about Rott's history.

### (c) Household Precautions

The majority emphasizes that the "household takes precautions such as ensuring there is a lock on the bathroom door, adjusting shower schedules, establishing a dress code, having the girls change in private, and limiting [Rott's] time alone with one child." But Kyel said that she and Rott had taken precautions around the house because the girls were not used to living with a male, not because of Rott's history. Rott similarly said he and Kyel took precautions to make the children and their friends feel safe, not because he was a risk to them.

More troubling, Rott had significant unsupervised access to the children. Kyel acknowledged that two safety precautions she had discussed in therapy were avoiding secrets and avoiding her daughters' spending time alone with Rott. Nonetheless, she said that one daughter had gone hunting with Rott alone "a couple of times." Rott said he did not spend time alone with just one child "unless you want to call going hunting for two hours" time alone. Kyel's working hours were usually from 6 a.m. to 2:15 p.m. Rott said he was home alone with the children from about 6 to 7 a.m. when he left for work.

### (d) Schwan Offers No Opinion
### on Rott's Risk of Reoffense

Despite Schwan's stated concerns about Kyel's judgment and past conduct and despite Schwan's inability to assess whether Rott presented a recidivism risk, she opined that the children were not at risk living with Kyel. She said she had worked with the children to determine if appropriate boundaries were in place in the home and whether any red flags indicating a risk were present, particularly grooming behaviors. She had not perceived any and did not see any need for a safety plan. Her focus was on the family's not having secrets. And she said that the children had not reported anything to make her think that they would be unsafe living with Rott.

But on cross-examination, Schwan acknowledged that the children had not told Kyel about incidents involving Rott's explosive temper until she encouraged them to do so in therapy. Once, while driving very fast on a gravel road, Rott had slammed on his car's brakes when he became angry with the children for not doing their chores. Another time, he had thrown a brick at a Quonset building when he was angry with one of the children, who had also seen him punch a grain bin and did not tell Kyel. But these incidents did not cause Schwan to think that Rott presented a significant risk of harm. This same child said Rott had never hit her and denied feeling endangered by him. But she did not talk to him much

and said that his anger was a factor that weighed against her living with Kyel.

## 2. EVIDENCE WAS INSUFFICIENT TO SHOW NO SIGNIFICANT RISK

Rott's and Kyel's testimonies were inconsistent on why Kyel minimized Rott's conduct to Schwan. Was it because Rott had minimized his account to Kyel? Or did Kyel minimize his conduct to Schwan, despite knowing the full extent of what he had done? Schwan believed that Rott had minimized to Kyel his previous sexual assaults. But contrary to the majority's opinion, Rott's and Kyel's testimonies did not refute Robert's claim that Kyel took no steps to investigate Rott's criminal history before moving her children in with him. Schwan specifically testified that she was concerned by Kyel's moving in with Rott without knowing the full extent of what he had done.

The record shows that Schwan's investigation into Rott's criminal history is the only reason that Kyel ever provided any information to her daughters about Rott's past. Her excuse that she did not want to stigmatize them at school cannot be reconciled with her testimony that she told their friends' parents about Rott's sex offender status. Kyel also refused to tell Robert about Rott's status, thus concealing her poor judgment—because Robert would have known that this was the second time that Kyel and her daughters had lived with a sex offender. Minimally, the evidence strongly suggested that because of Kyel's desire to maintain an emotional attachment to Rott, she would resist an honest assessment of evidence that Rott posed a risk to her daughters.

Unsurprisingly, Rott's criminal history, coupled with Kyel's history of living with a different sex offender who had sexually assaulted her oldest daughter, caused Schwan to question Kyel's judgment and ability to protect her daughters. And Schwan was concerned about Rott's minimizing of his sexual assault behavior, a known impediment to rehabilitation.

Yet, despite Schwan's investigation into Rott's sex offender treatment, she could not opine whether he presented a recidivism risk.

The majority, like the lower courts, relied, in part, on Rott's participation in sex offender treatment programs to conclude that Kyel had rebutted the presumption of risk. But Rott's treatment evaluation would be significant evidence of his risk, and Kyel did not produce it. So Rott's statement that he had satisfactorily completed the treatment did not show that he had been rehabilitated or rebut the presumption of significant risk absent evidence of his treatment evaluation showing that he did not present such a risk.

In the light of Schwan's concerns about Kyel's poor judgment and her admission that she did not know whether Rott had been rehabilitated or presented a recidivism risk, Schwan's opinion that these children were not at risk was unpersuasive. The supposed household precautions did not allay concerns about Kyel's judgment or Rott's recidivism risk. Schwan would not have asked Kyel to take precautions if there was no risk. And Schwan was curiously unconcerned about evidence that Rott could not control his anger impulses around the children. Research has shown that apart from a sexual interest in children, the second strongest predictive factor of sexual recidivism is an "antisocial lifestyle and orientation, as characterized by . . . 'reckless, impulsive behavior.'"[45] Lifestyle impulsivity has a well-established correlation with sexual recidivism.[46]

Schwan's failure to evaluate Rott's recidivism with known risk factors may be consistent with her statements that she was not his therapist. But her testimony failed to show that the

---

[45] Harris, *supra* note 37 at 37.

[46] See, Cortney E. Lollar, *Child Pornography and the Restitution Revolution*, 103 J. Crim. L. & Criminology 343 (2013); Robert A. Prentky et al., *Recidivisim Rates Among Child Molesters and Rapists: A Methodological Analysis*, 21 Law & Hum. Behav. 635 (1997).

children were not at risk. And the "considerable weight" that the trial court placed on Schwan's testimony was contrary to Schwan's acknowledgment that she could not opine whether Rott had been rehabilitated or presented a recidivism risk.

Moreover, all the evidence—if it existed—to rebut the presumption of a significant risk of harm was available to Kyel through Rott. She could have presented his risk assessment, the length of his required registration, and his treatment evaluation to prove that he did not have a significant risk of reoffense. Because she failed to present any of this evidence, the record suggests the documentation would not have been favorable to her. Alternatively, she could have obtained the opinion of a professional qualified to assess Rott's recidivism risk. As stated, an individualized psychological assessment is another means of showing no significant risk of recidivism.

But any sex offender and any custodial parent choosing to live with a felony sex offender will have incentive to claim that the offender is rehabilitated and that the parent's child is not at risk—even if the sex offender has actually been assessed with a high recidivism risk. As noted, sex offenders can present a recidivism risk up to 20 years after release or supervision.[47] So, no matter how credible such testimony appears, a trial court will not know the real risk a child is exposed to absent a valid risk assessment. I believe that concluding that the presumption of risk is rebutted by self-serving testimony and the opinion of a witness who has not performed a valid risk assessment will lead to absurd results that place children at risk.

Robert did not have access to the information for a reliable risk assessment. And under *Watkins*, he was not required to present it. Nor did the court have the information or expertise needed to assess Rott's recidivism risk. So the burden fell on Kyel, as the party living with a sex offender, to rebut the presumption of a significant risk by obtaining the relevant information from Rott or obtaining a risk assessment from someone

---

[47] See *Slansky, supra* note 27.

qualified to make it. Because she failed to do so, the evidence did not support a reasonable finding that the children were not at significant risk of harm, much less rebut the presumption by a preponderance of the evidence.

As stated, the effect to be given a statutory presumption and the type of evidence required to overcome it present questions of law that we independently review.[48] When a child is living with a person who has previously committed a felony sex offense against a minor and has unsupervised access to the child, I would hold that evidence of a valid risk assessment is required to rebut the presumption of significant risk. Absent a valid risk assessment, a court's conclusion that the offender poses no significant risk to the child is unsupportable and untenable. I conclude that Kyel failed to rebut the presumption under § 43-2933(1)(c) as a matter of law and that the trial court abused its discretion in concluding otherwise.

Because the presumption controls, Robert has met his burden of showing that a statutorily mandated change of circumstances exists to support a change of custody, regardless of whether the evidence would be sufficient to show a material change in circumstances under our case law. I would reverse, and remand with instructions for the Nebraska Court of Appeals to instruct the district court to modify the custody disposition to make Robert the primary custodian and to consider the circumstances under which Kyel would be permitted visitation.

---

[48] See *Dawes, supra* note 32.

Miller-Lerman, J., dissenting.

For purposes of this dissent, I accept and apply the legal framework adopted by the majority, but I respectfully dissent from the majority's assessment of the evidence. Upon my review de novo on the record, I believe that the district court erred when it denied Robert's counterclaim for modification and that the Nebraska Court of Appeals erred when it

affirmed that decision. I would reverse, and award custody to Robert.

Taken as a whole, the evidence shows that the environment surrounding Thomas' prior felony sexual assault crime bears a strong resemblance to the current domestic setup. Kyel remains largely in denial, and the therapist who testified as to the risk Thomas may pose had never interviewed Thomas.

In my view, the record contains convincing evidence that Thomas posed a significant risk of harm. Thomas was convicted of a felony count of attempted sexual assault, after being originally charged with two counts of sexual assault in the first degree and one count of sexual assault of a child. The assault victim was a minor who was Thomas' teenaged stepdaughter, similar to the children at issue in this case.

Thomas admitted to fondling and digitally penetrating the victim, but minimized the seriousness of his actions by claiming there were fewer instances over a shorter period of time than that alleged by the victim.

The evidence shows that Kyel is reluctant to acknowledge the extent of Thomas' criminal behavior, and she admits that she would prefer to ignore Thomas' sex offender history. Kyel has previously failed to recognize warning signs, exposing another of her daughters to alleged molestation by a previous love interest. It is not in the girls' best interests to entrust their safety to an individual who does not comprehend the hazards posed by their situation.

The record shows that therapist Schwan never met with Thomas and was not an expert in treating adult sex offenders; she evidently based her assessment of Thomas on her conversations with the girls and Kyel. The basis for Schwan's opinion is thin; Schwan's opinion itself is not robust or convincing.

Given that Thomas' criminal history is so concerning, and that even Kyel's evidence demonstrates avoidance and denial, I would find that the evidence satisfies Robert's burden under the statute and shows that the girls are at significant risk. Robert met his burden to show that modification was warranted.