IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

TROESTER V. TROESTER

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TIMOTHY D. TROESTER, APPELLANT,

V.

LINDA M. TROESTER, APPELLEE.

Filed April 23, 2019.    No. A-17-1044.

Appeal from the District Court for Hamilton County: RACHEL A. DAUGHERTY, Judge. Affirmed.

Steven B. Fillman for appellant.

Megan M. Zobel and Amie C. Martinez, of Anderson, Creager & Wittstruck, P.C., L.L.P., for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

PIRTLE, Judge.

## INTRODUCTION

Timothy D. Troester appeals from an order of the district court for Hamilton County which denied his complaint to modify his child support and alimony obligations. Based on the reasons that follow, we affirm.

## BACKGROUND

A decree was entered on December 12, 2012, dissolving the marriage between Timothy and Linda M. Troester. The provisions in the decree were based on a settlement agreement reached by the parties and approved by the court. Linda was awarded custody of the parties' one minor child, Jaime, born in 1998, subject to Timothy's parenting time. Timothy was ordered to pay $1,000 per month in child support. The calculation took into account Timothy's child support

- 1 -

obligation for a child from another relationship, who was born during the pendency of the dissolution proceedings. Timothy was also ordered to pay Linda $1,200 per month in alimony for a period of 60 months. After 60 months, the alimony increased to $1,600 per month for 36 months.

Pursuant to the settlement agreement, Timothy received $2,457,458 in marital assets and $1,748,565 in marital debts, for a net marital estate totaling $708,893. Linda received $227,292 in marital assets and no marital debts. To equalize the marital estate, Timothy was ordered to pay a money judgment to Linda in the amount of $240,000. The first $75,000 was due by March 1, 2013, and the remaining $165,000 was to be paid in five subsequent annual payments of $33,000 each. If Timothy was more than 30 days late on any payment, the entire balance was due immediately. As part of the settlement, the parties agreed that the tax obligation which resulted from the liquidation or disposition of any asset awarded would be the obligation of the party who liquidated or disposed of the particular asset.

On March 31, 2015, Timothy filed a complaint to modify decree, alleging there had been substantial and material changes in the financial circumstances and incomes of the parties to the extent that his child support obligation would decrease by at least 10 percent under the Nebraska Child Support Guidelines, and that his alimony obligation should be substantially reduced or completely eliminated. Linda filed an answer and counterclaim seeking a modification of Timothy's parenting time schedule. Timothy subsequently filed a reply to the counterclaim and a second cause of action for modification seeking increased parenting time with Jaime. As to the counterclaim and Timothy's second cause of action, the parties reached an agreement and entered into a stipulation which was approved by the court in an order dated September 28, 2016.

A trial was held on Timothy's complaint to modify child support and alimony. The evidence showed that Timothy's primary occupation at the time of the divorce in 2012 was as a farmer. At the time of the decree, Timothy was farming a total of 1,400 acres. Timothy was also employed as a sales representative selling seed corn for Pioneer Seed. He made $61,253 in 2012. Timothy testified that he had a substantial decrease in income from crop sales from 2012 to 2013 due to the decrease in grain prices and because he lost a lease to 305 acres of land he had been farming. Timothy acknowledged that he knew before the divorce was finalized that he was losing the lease to the 305 acres.

In 2012, farmers were selling their corn for an average price of $7 per bushel, but since then the price has decreased each year. Timothy testified that grain prices at the time of the divorce were as high as they had ever been in his farming career. In 2013, the average price for corn dropped to around $6 per bushel. Timothy sold most of his corn in 2012 between $6 and $8.50 per bushel and between $5 and $8 per bushel in the fall 2013 and spring 2014. By the time of trial in the fall 2016, corn was selling at an average of $3.50 per bushel. The input costs for growing corn had remained fairly stable between 2012 and 2016.

Jason Katt, a certified public accountant retained by Timothy, reviewed tax filings and income information provided by Timothy from 2012 to 2015. Katt testified that Timothy's farm income was reported on a cash basis, versus an accrual basis. For 2012, Timothy's farm income on a cash basis was negative $244,747, but had it been reported on an accrual basis, or when the income was actually earned, it would have been $522,398, including rental and wage income. Timothy's child support obligation was based upon Timothy earning $136,000 annually.

Katt testified that in 2013, Timothy's reported farm income was $649,167, but using the accrual method it would have been $30,508, including rental and wage income. Timothy also continued to work for Pioneer Seed in 2013 and earned $62,567.

Timothy testified that in 2014 his income declined further because crop prices continued to fall and because he was farming even fewer acres than in 2013. Timothy sold the house and acreage he was living on and in conjunction with that, he lost a lease to farm the adjacent 770 acres. Timothy's lease to farm the 770 acres was tied to his ownership of the acreage and thus, the lease terminated when Timothy sold the acreage. After losing the 770 acres of farm ground, Timothy had approximately 300 acres of land to farm in 2014. Timothy claimed he sold the house and acreage because he could not get additional loans he needed to continue farming and he needed to pay off loans he already had. He sold the acreage for $600,000. At the time of the divorce settlement, the acreage was valued at $223,000. He was able to sell the house and acreage for a much higher price than it was valued at the time of the divorce because it included the right to lease the 770 acres.

Timothy testified that he also sold most of his farm equipment in 2014 because his operating loans were not renewed. He testified that the proceeds from the sale of the acreage and farm equipment were used to pay debts. The sale of the equipment resulted in over $1,000,000 in capital gains. In addition, Timothy lost $6,600 per year in rental income because he moved into a home he had been renting out after he sold the acreage.

For 2014, Timothy's reported farm income was $275,723. Using the accrual method, his farm income, plus rental and wage income was $122,378. Timothy had income from selling seed for Pioneer Seed of approximately $74,394. He also earned over $64,000 in 2014 selling seed tenders for Meridian. Timothy had been a sales representative for Meridian at the time of the divorce until 2014. He testified that he quit selling Meridian products because as a sales representative he had to purchase his inventory and then resell it and he could not obtain the financing to do that. Timothy liquidated the inventory he had in 2014 and claimed he did not make any profit.

Timothy testified that in 2015, the acres he farmed decreased from 300 to 80 because he could not get financing to farm the entire 300 acres. He rented equipment from a neighbor to farm the 80 acres. At the time of trial he had locked in a selling price of $4.10 per bushel for his corn grown in 2015. He testified that farming is not profitable now because the cost of production is higher than the price paid for selling corn.

Timothy had around $200,000 in additional capital gains in 2015 due to selling more farm equipment. Timothy also purchased a grain trailer, truck engine, forklift, and diesel overhaul at a cost of nearly $100,000 that same year.

For 2015, Timothy's reported farm income was $84,896 on a cash basis, and under the accrual method it would have been $2,459. Timothy also made $69,601 as a seed sales representative in 2015.

Timothy claimed that for the first half of 2016, his net income was a net loss of over $35,000. He stated that his primary occupation at the time of trial was as a truck driver for a trucking business he started. He estimated that he worked an average of 70 to 80 hours per week for his trucking business. For the first half of 2016, he earned over $56,000, but claimed he had

$46,000 in expenses, resulting in $10,000 in net income. He also testified that he had to borrow $25,000 for repairs to his semi-truck to keep his business going in 2016. He also testified that he was working 15 hours per week for Pioneer Seed, and expected to earn over $51,000 in 2016. He also continued to farm in 2016, despite knowing that he would not make a profit. He testified that he plans to continue farming in the future even though it is not profitable because it is what he loves to do. He further testified that since the divorce, he has only applied for four jobs and they were all with Pioneer Seed.

At the time of trial, Timothy was living in a home owned by his parents. He testified that he owes them $40,000 for the house and buildings on the land, but he had not made a payment to them in the past 2 years. He also testified that he owed $706,000 in state and federal taxes due in large part to the capital gains in 2014 and 2015 and that he does not have the funds to pay down this debt. He also testified that at the time of trial there had been no efforts by the IRS to collect the money it was owed. The State however had seized money from his bank accounts to pay for the State taxes Timothy owed. As a result, Timothy started putting his money in bank accounts under the name of his girlfriend Monica Kleinschmidt, with himself as an authorized user. He testified that he did this because the State could not seize his funds if they were in Monica's name.

Other evidence showed that in 2013, Timothy paid a private investigator more than $61,000 to prove the mother of his son was unfit so he could obtain custody of his son. At the time of trial, Timothy had custody of his son. Timothy claimed that the private investigator made $15,000 in unauthorized charges to his credit card.

From September 2013 to February 2014, Timothy had numerous charges on his credit card for "professional services" but denied knowing what these charges were for. Timothy also acknowledged that he had made numerous charges related to online dating. There were nearly $21,000 of expenditures on his credit card related to "professional services" and online dating. There were also several charges for a male enhancement drug on his credit card.

Timothy also testified about his relationship with his girlfriend, Monica. She moved in with Timothy in August or September 2015, and her three children moved in a month later. Monica does not pay Timothy rent, but he claims she buys some food. Monica provides childcare to Timothy's minor son and he pays her $300 per month to do so. Timothy claimed before Monica moved in he was paying a nanny over $2,000 per month to provide childcare. Timothy also pays Monica $600 per month for bookkeeping duties.

Timothy admitted to financially assisting Monica and her children for about 9 months during a time she was not receiving child support, and has continued to help them financially. In 2015 Timothy paid over $4,000 in legal fees for Monica in her divorce. He has also paid for Monica's student loans, counseling services, medication, nail salon expenses, clothing, car payments, plane tickets, massages, and helped her start a Mary Kay business. He also paid $4,000 that Monica owed for a breast augmentation, and bought her a new phone and added her to his cellular phone plan. There were also recurring monthly payments made to "Adore Me," for underwear and bras for Monica.

Timothy also paid for Monica's children's extracurricular activities (dance and piano lessons), medical expenses, orthodontic expenses, school lunches, and school tuition. Timothy also

testified about various vacations he took in 2015 and 2016 with Monica and her children. He testified to paying for most of the expenses associated with these trips.

In the month of August 2016 alone Timothy paid $1,766 toward Monica's son's college tuition, plus another $500 shortly thereafter. He also paid for Monica's daughter's school lunches, Monica's migraine medication, and part of Monica's children's orthodontic bill. That same month, Timothy only paid $400 for child support and no alimony. Timothy testified that he felt obligated to provide for Monica and her children, as "[t]hey're part of my new family. My life is moving on."

During 2015 and 2016, Timothy made repairs to the home in which he was living totaling approximately $15,000. Timothy claims the repairs were necessary due to the age of the home. In May 2016, Timothy purchased dogs for a new dog-breeding business for $2,000. He also purchased four Nebraska football tickets, plus a $600 donation to the University of Nebraska Foundation, costing him $2,800. Timothy also testified that he makes monthly payments to support a child in a third-world country, and pays $260 per month for two storage units.

Timothy testified that in the spring 2016, Monica received back child support from her ex-husband and she paid Timothy back "some significant amounts" for items he had paid for her children. He also testified that Monica pays him back money he spends on her children with her wages, which incidentally are paid by Timothy.

Following trial, the trial court entered an order denying Timothy's complaint to modify child support and alimony, finding that Timothy's request to reduce his child support and alimony obligations was not made in "good faith." The court stated that it was not apparent that Timothy's financial troubles were due solely to circumstances outside his control, and that it appeared that the change in the economy had only affected his ability to support Jaime and Linda and not his ability to support himself, his son, Monica, and her three children. The court further found that based upon the evidence before it, Timothy acted with unclean hands.

## ASSIGNMENTS OF ERROR

Timothy assigns that the trial court erred in (1) denying his complaint to modify child support and alimony, finding that he failed to show a material change in financial circumstances outside of his control, and (2) denying his complaint to modify child support and alimony on the basis that he acted with unclean hands.

## STANDARD OF REVIEW

Modification of a dissolution decree is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion by the trial court. *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018).

ANALYSIS

Timothy first assigns that the trial court erred in denying his complaint to modify child support and alimony on the ground that he failed to show a material change in financial circumstances outside of his control. He argues that the evidence showed that his income from farming had significantly decreased since the decree due to a severe drop in grain prices, warranting a modification of his child support and alimony obligations.

*Child Support.*

A party seeking to modify a child support order must show a material change in circumstances which (1) occurred subsequent to the entry of the original decree or previous modification and (2) was not contemplated when the decree was entered. *Fetherkile v. Fetherkile*, 299 Neb. 76, 907 N.W.2d 275 (2018).

Among the factors to be considered in determining whether a material change of circumstances has occurred are changes in the financial position of the parent obligated to pay support, the needs of the children for whom support is paid, good or bad faith motive of the obligated parent in sustaining a reduction in income, and whether the change is temporary or permanent. *Id.* Further, the Nebraska Child Support Guidelines state that "[i]f applicable, earning capacity may be considered in lieu of a parent's actual, present income and may include factors such as work history, education, occupational skills, and job opportunities." Use of earning capacity to calculate child support is useful when it appears that the parent is capable of earning more than is presently being earned. See *Rauch v. Rauch*, 256 Neb. 257, 590 N.W.2d 170 (1999). But, the paramount concern in child support cases, whether in the original proceeding or subsequent modification, remains the best interests of the child. *Fetherkile v. Fetherkile, supra.* Accordingly, it is invariably concluded that a reduction in child support is not warranted when an obligor parent's financial position diminishes due to his or her own voluntary wastage or dissipation of his or her talents and assets and a reduction in child support would seriously impair the needs of the children. *Id.* The party seeking the modification has the burden to produce sufficient proof that a material change of circumstances has occurred that warrants a modification and that the best interests of the child are served thereby. *Id.*

To determine whether there has been a material and substantial change in circumstances warranting modification of a divorce decree, a trial court should compare the financial circumstances of the parties at the time of the divorce decree, or last modification of the decree, with their circumstances at the time the modification at issue was sought. *Metcalf v. Metcalf*, 278 Neb. 258, 769 N.W.2d 386 (2009).

As previously stated, Timothy argues that the evidence showed that his income from farming had significantly decreased since the decree due to a severe drop in grain prices. We agree that the evidence established that the price for corn had decreased and affected Timothy's income. However, a change in grain prices was contemplated at the time of the decree. The provisions in the decree were based on a settlement agreement between the parties. Timothy agreed to pay $1,000 per month in child support, knowing what grain prices were and what his income was at the time. Timothy had been a farmer for a long time and accordingly, was aware at the time he agreed to the property settlement that grain prices fluctuate, thereby varying a farmer's income

from year to year. Timothy testified that at the time he entered into the settlement agreement, the price for corn was as high as he had ever seen it. He entered into the settlement agreement knowing that corn prices could drop in the years following the decree.

In addition to the evidence that the price for corn had decreased since the decree, the evidence also showed that there were a number of other factors affecting Timothy's financial position and his ability to pay his child support and alimony obligations. As the trial court found, Timothy's financial troubles were not due solely to circumstances outside of his control.

At the time of trial Timothy continued to farm his remaining 80 acres despite knowing that he was losing money doing so. In the first half of 2016, he earned less than $27,000 in farming income, and had over $62,000 in farming expenses. He testified that he planned to continue to farm into the foreseeable future because it is what he loves to do. By continuing to farm, Timothy was negatively affecting his financial position and voluntarily wasting or dissipating his assets. See *Lambert v. Lambert*, 9 Neb. App. 661, 617 N.W.2d 645 (2000) (petition for modification or termination of alimony will be denied if change in financial condition is due to fault or voluntary wastage or dissipation of one's talents and assets).

Timothy argues that he has tried to improve his financial circumstances by transitioning from farming to trucking and also continuing as a sales representative for Pioneer Seed. He testified that he started a trucking business where he was working as many hours as two full-time jobs but his net income for the first 6 months of 2016 was only $10,000. He also had to borrow $25,000 for truck repairs in 2016. Timothy also testified that he was working 15 hours per week for Pioneer Seed and expected to make over $51,000 in 2016. In the past he had made up to $70,000 per year at this job. Timothy was also paying Monica $300 per month for childcare and $600 per month for bookkeeping.

The evidence demonstrates that Timothy was capable of earning more than he was earning at the time of trial. Timothy had voluntarily chosen to continue farming while losing money, and had chosen to start his own trucking business where he is working countless hours but making little money. He is only working 15 hours per week at the job that had the most earning potential. Timothy testified that he had only applied for four jobs since the divorce, all with Pioneer Seed. Although his highest level of education is a high school degree, the evidence showed that Timothy had the ability to earn more than he was making at the time of trial. He has years of experience as a farmer and in farming operations. Although farming the land he had left was not profitable, there may be other farming-related jobs he would be qualified to do. He also had experience as a salesman, having sold seed for Pioneer Seed and seed tenders for Meridian. He also had experience as a truck driver. At the time of trial, Timothy was not earning an income indicative of his earning capacity.

The evidence also showed, as the trial court found, that while there had been a change in the farming economy, that change only affected his ability to support Jaime and Linda and not his ability to support himself, his son, Monica, and her three children. This was made evident by Timothy's testimony that he felt obligated to provide for Monica and her children, as "[t]hey're part of my new family. My life is moving on." It appears Timothy has the ability to pay his support obligations but has chosen the pay for other expenses of his own, make other purchases, and pay for items for Monica and her children. Timothy has paid for Monica's legal fees, student loans,

counseling services, medication, nail salon expenses, clothing, car payments, plane tickets, massages, and a monthly underwear and bra subscription. He has also helped her start a Mary Kay business, paid $4,000 toward a breast augmentation, and bought her a new phone and added her to his cellular phone plan. Timothy also paid for Monica's children's dance and piano lessons, medical expenses, orthodontic expenses, school lunches, and school tuition. He also paid for vacations he took with Monica and her children.

Timothy also spent money on "professional services," online dating, remodeling his home, and football tickets. He also bought equipment that cost nearly $100,000 the same year he was selling farm equipment, spent more than $60,000 on a private investigator, and spent $2,000 to start a dog breeding business.

The support of one's children is a fundamental obligation which takes precedence over almost everything else. *Rauch v. Rauch*, 256 Neb. 257, 590 N.W.2d 170 (1999). Timothy has an obligation to support Jaime, his biological child, and must meet that obligation before voluntarily paying expenses for a girlfriend and her children. Timothy's choice to support Monica and her children has left him unable to meet his legally required obligation to support Jaime.

Although there had been a change in Timothy's financial position since the decree which was initially caused by a decrease in the price of corn, Timothy's financial position at the time of trial was due in large part to voluntary decisions he had made. The evidence shows that Timothy had the capacity to earn more than he was earning at the time of trial and would have assets available to pay child support if he would chose to do so. We conclude that the trial court did not err in finding that Timothy failed to show a material change in financial circumstances outside of his control.

*Alimony.*

Timothy's first assignment of error also alleges that the trial court erred in denying his complaint to modify alimony. Pursuant to Neb. Rev. Stat. § 42-365 (Reissue 2016), alimony orders may be modified or revoked for good cause shown. *Metcalf v. Metcalf*, 278 Neb. 258, 769 N.W.2d 386 (2009). Good cause means a material and substantial change in circumstances and depends upon the circumstances of each case. *Id.* Good cause is demonstrated by a material change in circumstances, but any changes in circumstances which were within the contemplation of the parties at the time of the decree, or that were accomplished by the mere passage of time, do not justify a change or modification of an alimony order. *Id.* The moving party has the burden of demonstrating a material and substantial change in circumstances which would justify the modification of an alimony award. *Id.*

It is well established that a "material change in circumstances" in modification of child support cases is analogous to the "good cause" standard articulated for modification of alimony. *Grahovac v. Grahovac*, 12 Neb. App. 585, 592, 680 N.W.2d 616, 623 (2004). We have already determined that Timothy's change in financial circumstances was not a material change in circumstances for child support purposes. Accordingly, we find that Timothy has failed to prove that there was good cause justifying modification of alimony for the same reasons we set out above concerning child support. Thus, the trial court did not err in denying Timothy's complaint to modify in regard to alimony.

*Unclean Hands.*

Timothy also assigns that the trial court erred in denying his complaint to modify child support and alimony on the basis that he acted with unclean hands. Because we have concluded that the trial court did not err in denying his complaint to modify on the ground that he failed to show a material change in circumstances in regard to child support and failed to show good cause to modify alimony, we need not address Timothy's second assignment of error. See *Jordan v. Jordan*, 26 Neb. App. 280, 918 N.W.2d 20 (2018) (appellate court is not obligated to engage in analysis not necessary to adjudicate case and controversy before it).

CONCLUSION

We conclude that the trial court did not err in denying Timothy's complaint to modify child support and alimony. Accordingly, the order of the trial court is affirmed.

AFFIRMED.