IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
(Memorandum Web Opinion)


SWAHN V. SWAHN


NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).


GWYNNE S. SWAHN, NOW KNOWN AS GWYNNE S. GONNERMAN, APPELLANT,

V.

CURTIS H. SWAHN, APPELLEE.


Filed March 1, 2022.    No. A-21-367.


Appeal from the District Court for Washington County: JOHN E. SAMSON, Judge. Affirmed.

Jane F. Langan Mach, of Rembolt Ludtke, L.L.P., for appellant.

Edward D. Hotz, of Pansing, Hogan, Ernst & Bachman, L.L.P., for appellee.


MOORE, ARTERBURN, and WELCH, Judges.

ARTERBURN, Judge.

### INTRODUCTION

Gwynne S. Swahn, now known as Gwynne S. Gonnerman, appeals from an order of the district court for Washington County which denied her complaint to modify Curtis H. Swahn's alimony obligations. Based on the reasons that follow, we affirm.

### BACKGROUND

Following trial, a decree of dissolution was entered on December 17, 2010, dissolving the marriage between Curtis and Gwynne. The decree awarded Gwynne the marital residence and awarded Curtis ownership of Ultimate Thermal, Inc., a construction company that specializes in cold storage construction that the parties started together in 1998 and owned together during the course of their marriage. At trial, Gwynne did not request to retain any portion of the company, but the issue of valuation was contested. The decree stated: "Curtis will become the sole owner, shareholder, and operator of Ultimate Thermal, Inc. He will, as such, enjoy its profitability as a

successful enterprise, including his annual salary, generous shareholder advances, and other nice benefits." The court valued the company at a figure which was between the amounts sought by the parties.

The decree noted that Gwynne, at the time of the decree, "has only a temporary part-time job, and will require a period of time either to further her education or to assist her with the transition into the full-time work force." The court also observed in the decree that "[t]here is clearly a disparity in income or potential income between Gwynne and Curtis." After noting this disparity, the court ordered Curtis to pay Gwynne $6,500 per month in alimony for 60 consecutive months beginning January 1, 2011, and concluding on December 1, 2015. The court also ordered Curtis to pay Gwynne $5,000 per month in alimony for 60 consecutive months beginning January 1, 2016, and concluding on December 1, 2020. The total amount of alimony ultimately paid by Curtis over a 10-year period was $690,000. Additionally, the court ordered Curtis to pay to Gwynne an equalization payment of $458,434.93 in four annual installments of $114,608.74 plus accrued interest. The first installment was due on July 1, 2011, with the final installment due on July 1, 2014. Curtis made all of the required payments in accordance with the decree. Gwynne did not appeal from the decree entered by the district court.

On December 16, 2019, 9 years after the decree was entered, Gwynne filed a complaint to modify the decree of dissolution with respect to alimony. She alleged that there had been a material change of circumstances because Curtis' income had significantly increased beyond what was contemplated in the decree; Gwynne's ability to invest in retirement had been severely limited by her income since the decree, and Gwynne's living expenses had significantly increased since the decree. She requested an order modifying the amount and duration of alimony previously entered in the dissolution decree, for her attorney fees and costs, and for further relief as deemed appropriate by the court.

In March 2020, a trial was held on Gwynne's complaint to modify. The central focus of the evidence presented at trial was Curtis' financial circumstances, both at the time the decree was entered and at the time of the modification proceedings. However, Gwynne also presented evidence to demonstrate her current financial circumstances.

The evidence presented at the modification trial revealed that Ultimate Thermal was worth significantly more now than at the time of the dissolution proceedings. During his testimony at the modification trial, Curtis acknowledged that at the time of the dissolution trial, Ultimate Thermal was "cash poor." However, at the time of the modification trial, Curtis believed the company to have a value of $2.5 million and noted that it held over $2 million in its bank account.

The evidence presented during the modification proceedings also revealed that in line with the increase in Ultimate Thermal's value, Curtis' income had increased since the dissolution trial. The evidence showed that Curtis receives most of his income from profits from Ultimate Thermal, rather than wages. According to Curtis' tax records received at trial, Curtis' income had increased since 2010. While his income fluctuated from year to year, his tax returns from 2011 to 2019 showed his annual income ranged from $607,800 to $1,610,885. Although he explained that his 2020 tax return was not finished, he believes that his income would be over $1,000,000 for 2020. He also conceded that Ultimate Thermal made a lot more money than he had anticipated in 2010.

Curtis conceded that during the dissolution trial, he had testified that there had been an unusually lucrative contract that caused a recent "spike" in his income that he believed was

unlikely to be sustained. He also testified that he "guarantee[d] the spike is over." At that point, Curtis' annual income from Ultimate Thermal was approximately $300,000.

There was additional testimony from Ultimate Thermal employees with respect to the increase in the company's value. Ultimate Thermal's office manager testified that there had been an increase in company revenue from 2011 until 2020. Vincent Wilson, a certified public accountant, who has completed tax returns for Curtis and Ultimate Thermal recalled that there was a significant contract that occurred in 2008 or 2009, around the time of the original dissolution proceedings. That contract was for a project which was significantly larger than Ultimate Thermal's average contract to that point in time. He also explained that Ultimate Thermal's gross revenue increased significantly since the entry of the dissolution decree. Although Wilson could not remember what the specific projected income for Ultimate Thermal was in 2020, he did not believe that it was significantly different than the previous few years.

Gwynne presented evidence regarding her financial circumstances at the time of the decree as compared to at the time of the modification trial. At the time of the dissolution trial, Gwynne was employed part time at a church working approximately 20 hours per week at the rate of $10 per hour. She explained that her primary responsibility during the marriage was to care for the house so that Curtis could dedicate his time to building and operating Ultimate Thermal. She also had been the primary caretaker for the parties' children, but they were adults by the time the dissolution proceedings began. At the time of the dissolution trial, Gwynne did not want to be awarded the marital residence, but following trial she had changed her mind. Her wish was communicated to the district court which awarded her the house and the indebtedness thereon.

Following the entry of the decree, Gwynne did not work for a couple of years because she testified that she needed to "get healthy." She was then employed as the executive director of a nonprofit entity for 5 years in which she earned between $40,000 and $45,000 per year. She explained that she did not have a retirement plan at this position. She left that position and began working at another nonprofit as a major gifts officer before getting promoted to be the donor relations manager, close to trial. Her salary increased from $60,000 per year to $68,000 per year as of the time of trial. She also has a retirement plan which allows up to 4 percent of her annual salary to be matched by her employer.

Gwynne explained that following the entry of the decree she met with a financial planner to determine what steps she needed to take so that she would be able to retire at the age of 70 and have an annual income of $40,000 per year during retirement. At the time of the modification trial, she was 57 years old. She explained that she had not previously set aside money for retirement because she and Curtis agreed that their retirement plan was Ultimate Thermal. However, she acknowledged that under the terms of the decree she received $75,000 in a retirement account and at the time of the modification trial, she had saved approximately $200,000 for retirement. She explained that she was advised that she would need to save $26,000 per year and downsize her residence to reach her retirement goals. She had started to reduce her other expenses so that she could try to "catch up for how far behind" she was on her retirement goals. However, she had not yet made the decision to sell the marital residence. Gwynne utilized a portion of the first equalization payment and all of the second and third payments to pay off the mortgage. The house was valued at $365,000 in the decree and according to Gwynne had appreciated to a value of $500,000 at the time of the modification trial.

Gwynne explained that given her current salary, she was unable to pay her actual monthly expenses in addition to saving necessary funds to contribute to her retirement goals. She explained that she used much of the first equalization payment to pay her legal bills from the dissolution proceedings and to pay certain accounting bills. Gwynne testified that she used the fourth and final equalization payment to supplement her income because she was unable to pay her actual monthly expenses. According to Gwynne, the original alimony award of $6,500 per month for the first 5 years did not cover half of her monthly expenses. She presented evidence that previously, her monthly expenses were $15,516 per month. However in 2020, those expenses had been reduced to $14,338.67.

Gwynne testified to changes in her lifestyle since the parties' divorce. She explained that she drives a vehicle with over 155,000 miles on it and has changed the way she shops and heats and cools her home. She has postponed some necessary household repairs because she was afraid she would "go[] negative." For example, Gwynne testified that the swimming pool at the marital residence needed significant maintenance, including a new heater and repairs to stop the pool from leaking water. In addition, the marital residence has a 21-year-old furnace and air conditioner which would likely need replacement in the near future. She further explained that she needs to make the repairs to the house whether she planned on staying in the home or selling it. On her list of expenses, she included $1,250 per month in repairs that she anticipated would need to be accomplished. We note that included in the expenses listed by Gwynne were a significant property tax burden related to the marital residence and a number of discretionary items.

In sum, Gwynne testified that her total income has decreased since 2010 and Curtis' income has increased. She conceded that at the time of the dissolution trial, she believed Curtis' income would increase; however, she did not expect that his income would increase so dramatically. At the dissolution trial, Gwynne explicitly testified that she believed that Curtis' potential was unlimited. At that time she testified that his potential was huge if he worked on the business in a productive manner. At the modification trial, Gwynne attempted to clarify her previous testimony by explaining that she was not speaking to Curtis' financial potential. Curtis also acknowledged that his income has increased beyond his expectations as related in his testimony during the dissolution trial.

Gwynne testified that at her current income level, she is not able to meet her current monthly expenses, even with the changes to her lifestyle. She testified that she does not think that she would be able to make her monthly expenses even if she decreased her retirement contributions. In her opinion, she would only be able to retire at 70 if she continued to make significant retirement contributions which would have to be funded by additional alimony. To that end she requested that her alimony be extended for an additional 13 years. When asked to state a desired amount, Gwynne testified she would leave that determination to the court.

Finally, we note that during the course of trial, Gwynne testified that she would likely need to sell the marital residence. To that end, she requested that Curtis provide her with information relating to their purchase of the residence that she would need for tax purposes. No formal motion was made regarding this request, nor was it contained in the complaint for modification. The district court made no mention of this request in its order.

Following the modification trial, the district court issued a detailed written order which thoroughly addressed the issues raised in the complaint for modification. We note that the two

trials in this case were heard by different district judges. However, the entirety of the evidence presented in the first trial was received in the modification trial. After taking the case under advisement, the court determined that Gwynne failed to establish good cause existed to modify the decree. The district court noted that during the original dissolution trial, the parties presented evidence regarding multiple complex issues related to the valuation of Ultimate Thermal. In fact, each party had retained their own expert to value the business. Essentially, the district court found that valuation of Ultimate Thermal was fully litigated during the original dissolution proceedings and that the issue of valuation was essentially decided in Gwynne's favor. As such, it appears the court put little weight in Ultimate Thermal's increase in value. The court further found that the decree of dissolution contemplated the disparity in future income between Gwynne and Curtis. In reaching its conclusion, the court addressed the three alleged material changes of circumstances listed in the complaint to modify. First, the court considered Curtis' increase in income and the disparity that the original district judge found to exist. The court stated as follows:

> Clearly Judge Steinke was aware of the disparity in income or potential income of [Gwynne] and [Curtis] by the detailed findings he made in his determination of alimony, to wit:

> The parties married at age 18 and have been married for 28 1/2 years. The marriage produced two children, both of whom are now emancipated. Both [Gwynne] and Curtis are 47 years old and enjoy good health. Curtis is a high school graduate. [Gwynne] is likewise a high school graduate and recently earned a college degree in busines[s] while this case has been pending. [Gwynne] testified she would like to further her education, and perhaps seek admission to law school.

> The evidence shows that Curtis has worked in some form of construction for cold storage construction for most of the marriage. The evidence shows that [Gwynne] moved with Curtis to advance his career and has worked variously providing in-home daycare, working at a daycare center at a church, and finally helping establish Ultimate Thermal in its early days before becoming a full-time homemaker . . . . [Gwynne] just obtained her college degree while this case has been pending and is making efforts to become self-supporting. She recently accepted a job where she previously worked, but this is a temporary position allowing 12-20 hours per week for three months at a rate of pay of $15.00 per hour.

> *There is clearly a disparity in income or potential income between [Gwynne] and Curtis. By the terms of this Decree and as set forth above, Curtis will become the sole owner, shareholder, and operator of Ultimate Thermal Inc. He will, as such, enjoy its profitability as a successful enterprise, including his annual salary, generous shareholder advances, and other nice benefits. [Gwynne], on the other hand, has only a temporary part-time job and will require a period of time either to further her education, or to assist her with the transition into the full-time workforce.* (Emphasis added [by district court])[.]

However, the district court did note Curtis' incongruous testimony from the dissolution proceedings in which he guaranteed that the increased revenue experienced by Ultimate Thermal during 2008 and 2009 would not continue. The court then noted that under the decree, Gwynne had received $690,000 in alimony payments. Based on the findings made in the decree, the court

found that the original trial judge had fully contemplated Curtis' income potential and the disparity of income. As such, the court concluded that Gwynne failed to prove that Curtis' income had significantly increased beyond what was contemplated in 2010.

The district court also addressed whether Gwynne's ability to invest in her retirement has been limited by her earned income since the entry of the decree. The court noted that Gwynne was not working full time at the time of the dissolution proceedings, but was now working full time, was earning $68,000 per year, and was able to save significant money through her current employment. In addition, the court noted that Gwynne had a net worth in excess of $700,000 which included an accrued retirement account with a value of approximately $200,000, the marital residence which had a fair market value of approximately $500,000 plus items of personal property including two vehicles.

Finally, the district court addressed whether Gwynne's living expenses have significantly increased since the decree. Gwynne's stated expenses were approximately $15,516 per month at the time of the dissolution trial and were down to $14,338.67 in 2020. The court noted that Gwynne has attempted to change her lifestyle to meet her expenses. However, a significant amount of her monthly expenses were associated with the marital residence which the court noted was only awarded to her because she specifically requested it during the dissolution action. The court noted that in her testimony at the original trial, Gwynne testified that she could not afford the marital residence and could not justify spending the amount of money necessary for her to maintain it. The court noted that Gwynne utilized a significant portion of the equalization payments to pay off the mortgage, but still was paying in excess of $3,000 per month in house-related expenses. As such, the court found no material change of circumstance based on Gwynne's inability to invest or her living expenses. Finally, the court ordered each party to pay their own attorney fees.

Gwynne now appeals to this court.

ASSIGNMENTS OF ERROR

On appeal, Gwynne assigns four errors, which we consolidate to three errors for our review. Summarized, Gwynne assigns and argues that the district court erred in denying her request to modify Curtis' alimony obligation. In addition, Gwynne assigns and argues that the district court erred in failing to order Curtis to provide certain documents that Gwynne alleges are necessary for Gwynne to sell the marital residence and in failing to award her attorney fees.

STANDARD OF REVIEW

Modification of alimony is a matter entrusted to the discretion of the trial court, whose order is reviewed de novo on the record, and which will be affirmed absent an abuse of discretion. *Hopkins v. Hopkins*, 294 Neb. 417, 883 N.W.2d 363 (2016); *Northwall v. Northwall*, 238 Neb. 76, 469 N.W.2d 136 (1991). A judicial abuse of discretion exists if the reasons or rulings of a trial judge are clearly untenable, unfairly depriving a litigant of a substantial right and denying just results in matters submitted for disposition. *Connolly v. Connolly*, 299 Neb. 103, 907 N.W.2d 693 (2018).

In an action for modification of a marital dissolution decree, the award of attorney fees is discretionary with the trial court, is reviewed de novo on the record and will be affirmed in the absence of an abuse of discretion. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014).

ANALYSIS

*Modification of Alimony.*

Gwynne assigns and argues that the district court erred in denying her complaint to modify alimony. She contends that Curtis' income substantially increased since the entry of the decree of dissolution while her financial circumstances had not significantly changed. Based on these changed circumstances, Gwynne asserts that the district court should have modified the original alimony order as to amount and duration.

Pursuant to Neb. Rev. Stat. § 42-365 (Reissue 2016), alimony orders may be modified or revoked for good cause shown. *Metcalf v. Metcalf*, 278 Neb. 258, 769 N.W.2d 386 (2009). Good cause means a material and substantial change in circumstances and depends upon the circumstances of each case. *Id.* Good cause is demonstrated by a material change in circumstances, but any changes in circumstances which were within the contemplation of the parties at the time of the decree, or that were accomplished by the mere passage of time, do not justify a change or modification of an alimony order. *Id.* The moving party has the burden of demonstrating a material and substantial change in circumstances which would justify the modification of an alimony award. *Id.*

The Nebraska Supreme Court has previously explained that an increase in income is a circumstance that may be considered in determining whether alimony should be modified. *Northwall v. Northwall, supra.* However, a party's increase in income is not sufficient, alone, to require the court to modify the amount of maintenance previously ordered. *Simpson v. Simpson*, 275 Neb. 152, 744 N.W.2d 710 (2008). An increase in income must be considered in conjunction with changes in the other party's situation. *Id.* An award of alimony should be based not only on income, but also on the general equities of the situation considering the relative economic circumstances of the parties. *Grothen v. Grothen*, 308 Neb. 28, 952 N.W.2d 650 (2020). A trial court should compare the financial circumstances of the parties at the time of the divorce decree with their circumstances at the time the modification at issue was sought. *Id.*

In *Grothen v. Grothen, supra*, the parties entered into a property settlement agreement under which the husband received the parties' farmland and paid the wife $600,000 in cash immediately and further agreed to pay $2,500 per month in alimony for a period of 15 years. The husband later filed an application to modify his alimony obligation based on increased farming expenses, loss of rental cropland, and decreased grain prices. *Id.* At the same time, the wife continued to operate the same small business that she operated at the time the decree was entered. She testified that the business was not profitable, but that her ability to seek other employment was limited by medical issues she was experiencing. Those medical issues had also increased her expenses.

On appeal, the Supreme Court affirmed the district court's decision to deny the husband's request for modification. *Id.* The Supreme Court explained that although income was important, this is not an exclusive consideration. *Id.* The Supreme Court noted the husband's increased net worth and also agreed with the district court's finding that future fluctuations in the husband's farm income were within the contemplation of the parties at the time of the decree. The court noted that the husband had been engaged in farming for a significant period prior to the decree. *Id.* Based

on the totality of these circumstances the Supreme Court found no abuse of discretion in the district court's determination. *Id.*

At the dissolution trial in this case, the parties gave contrasting testimony regarding the future income Curtis could expect. Curtis testified that he believed the recent increases in income to Ultimate Thermal were unusual and went so far as to guarantee that such dramatic increase in income would not continue. Curtis also presented the testimony of other employees of Ultimate Thermal which corroborated his own beliefs. In contrast, Gwynne testified that she believed Curtis' potential was unlimited and that if he was devoted to running Ultimate Thermal in an effective way, his potential was huge. Therefore, we cannot say that the parties had uniform expectations regarding the future profitability of Ultimate Thermal and Curtis' income potential.

However, we do not look solely to the parties' expectations. A material change of circumstances constituting grounds for modification of a dissolution decree means the occurrence of something which, had it been known to the dissolution court at the time of the initial decree, would have persuaded the court to decree differently. *Grothen v. Grothen, supra.* In the decree, the district court found that a clear income disparity existed between the parties and noted that Curtis, as the sole owner and shareholder of Ultimate Thermal, would "enjoy its profitability as a successful enterprise, including his annual salary, generous shareholder advances, and other nice benefits." As such, it appears that the court agreed with Gwynne's testimony regarding Curtis' potential for future increased income. The court also recognized that Gwynne needed time to transition from part-time employment into the full-time work force. Because of its acknowledgement of the income disparity, Gwynne was awarded a total of $690,000 in alimony payments over 10 years in addition to equalization payments totaling more than $450,000. Based on the facts of this case, we do not find that Curtis' sustained increase in income considered in conjunction with Gwynne's financial circumstances at the time of trial constitutes a material change in circumstances justifying a modification in alimony. As such, we find no abuse of discretion in the district court's decision.

The evidence presented at the modification trial revealed that while Curtis had a substantial increase in income, Gwynne's financial condition also improved since the entry of the decree. At the time of the decree, Gwynne had completed a college degree but was working part-time for approximately $10 per hour. She had no money saved for possible retirement because she was anticipating that Ultimate Thermal would help pay for her retirement. However, as part of the property distribution, Gwynne received a retirement account in the amount of $75,000. At the time of the modification trial, Gwynne was gainfully employed earning approximately $68,000 per year and had over $200,000 in her retirement account. We note that on average, Gwynne received $69,000 per year in alimony. At the end of the 10 years of support, she had attained a salary which approximated that amount.

We also must consider the decisions Gwynne made immediately following the original trial and during the 10 years thereafter. While we, like the district court, do not minimize the mental and emotional toll that the divorce process may have taken on her, Gwynne chose not to work appreciably during the first 2 years following the entry of the decree. She then chose to work for nonprofit organizations thereafter, the first of which offered her a somewhat low salary and no benefits. Moreover, despite her testimony in the original trial that she could not afford and did not want to be awarded the marital residence, Gwynne specifically requested the residence be awarded

to her before the court entered the decree. Her testimony at the modification trial demonstrated that this residence continued to be a financial burden. Gwynne utilized over half of the equalization payments to pay off the mortgage, but was still burdened with significant expenses for taxes, repairs, routine maintenance, and utilities. At trial, Gwynne again acknowledged that she likely needed to sell the residence in order to reduce expenses. She did note, however, that if she were to sell the home, she believed that the value of the sale would be $500,000. Therefore, such a sale would not only decrease her expenses, but would allow her to invest at least a portion of the proceeds so as to provide income for retirement.

Gwynne's primary motivation for seeking an extended period of alimony is that she wishes to fund her retirement account sufficiently so that she can retire with a specified level of retirement income. That motivation does not fully square with the primary purpose of alimony. The primary purpose of alimony is to assist an ex-spouse for a period of time necessary for that individual to secure his or her own means of support. *Anderson v. Anderson*, 290 Neb. 530, 861 N.W.2d 113 (2015). While we understand that in some sense, Gwynne is asking that Curtis assist her further in securing financial support, her request at trial was that the continued alimony last for an additional 13 years. This is on top of approximately 2 years' worth of support paid by Curtis while the original case was pending and 10 years of support ordered in the decree. Given the substantial support already paid by Curtis coupled with Gwynne's ability to improve her employment to the point that she earns virtually the same amount annually as was paid on average by Curtis, we find it difficult to say that the primary purpose of alimony has not been achieved by virtue of the order contained in the decree. Though Curtis' financial condition has improved markedly more than Gwynne's, she has nonetheless bettered her circumstances. As such we cannot find that the parties' changes in financial standing are so great as to constitute a material change of circumstance. See *Sloss v. Sloss*, 212 Neb. 610, 324 N.W.2d 663 (1982). Therefore, we find no abuse of discretion in the district court's determination that these changes fail to constitute good cause for modifying Curtis' alimony obligations.

*Tax Documents.*

Gwynne next assigns and argues that the district court erred in failing to order Curtis to provide documents necessary for her to determine what taxable gain she would incur if she were to sell her home. We note that Gwynne's request was made during the course of her testimony. No motion was filed or orally asserted by counsel on this matter. The request does not appear in the complaint to modify, nor was it asserted as part of any motion to alter or amend following the rendition of the district court's order. We further note that at trial, Gwynne did not definitively state that she planned to sell the house. In her brief on appeal, she now represents that she has sold the home and argues that the district court erred by not including in its order a requirement that Curtis provide these documents to her. A trial court cannot err in failing to decide an issue not raised, and an appellate court will not consider an issue for the first time on appeal that was not presented to or passed upon by the trial court. *Vande Guchte v. Kort*, 13 Neb. App. 875, 703 N.W.2d 611 (2005). The issue complained of was not properly presented to the district court for decision. Accordingly, we do not address this assignment of error.

*Attorney Fees.*

Gwynne's final assignment of error is that the district court abused its discretion in failing to award her attorney fees.

Attorney fees and expenses may be recovered only where provided for by statute or when a recognized and accepted uniform course of procedure has been to allow recovery of attorney fees. *Garza v. Garza*, 288 Neb. 213, 846 N.W.2d 626 (2014). A uniform course of procedure exists in Nebraska for the award of attorney fees in dissolution cases, modification actions, or other cases involving domestic relations. See Neb. Rev. Stat. § 42-351(1) (Reissue 2016). Additionally, in dissolution cases, as a matter of custom, attorney fees and costs are awarded to prevailing parties. *Moore v. Moore*, 302 Neb. 588, 924 N.W.2d 314 (2019). In awarding attorney fees in a dissolution action, a court shall consider the nature of the case, the amount involved in the controversy, the services actually performed, the results obtained, the length of time required for preparation and presentation of the case, the novelty and difficulty of the questions raised, and the customary charges of the bar for similar services. *Dycus v. Dycus*, 307 Neb. 426, 949 N.W.2d 357 (2020). We review the case de novo on the record to determine whether there has been an abuse of discretion by the trial judge in its award of attorney fees. *Id.*

The district court found that Curtis was the prevailing party. We likewise affirm the decision of the district court in all relevant aspects. Accordingly, we find no abuse of discretion in the court's denial of an award of attorney fees to Gwynne.

CONCLUSION

For the foregoing reasons, we affirm the order of the district court denying Gwynne's complaint for modification.

AFFIRMED.